749 So.2d 310 (1999)
K.M. LEASING, INC., d/b/a White Heavy Express, J.D. Frazier, Individually and in His Capacity as an Employee of K.M. Le Asing, Inc., d/b/a White Heavy Express and Deborah S. Dempsey, Individually and in Her Capacity as Employee of K.M. Leasing, Inc., d/b/a White Heavy Express and John Doe, Appellants,
v.
Oscar Lee BUTLER, Sr., By and Through His Conservator, Dorothy BUTLER and Dorothy Butler, Individually, Appellees.
No. 97-CA-01344-COA.
Court of Appeals of Mississippi.
September 28, 1999.
*312 Louis G. Baine, III, Thomas Y. Page, Jan F. Gadow, Ridgeland, Attorneys for Appellants.
Levi Boone, Rick D. Norton, Cleveland, Attorneys for Appellees.
EN BANC.
*313 IRVING, J., for the Court:
¶ 1. As a result of a collision between an eighteen wheeler driven by Oscar Butler and another eighteen wheeler driven by Deborah Dempsey, Dorothy Butler, individually and as conservator of Oscar Butler, sued Dempsey and Dempsey's employer, K.M. Leasing, Inc. d/b/a White Heavy Express, along with J.D. Frazier, also an employee of K.M. Leasing, for personal injuries sustained by Oscar and loss of consortium sustained by Dorothy. At the close of trial, the jury rendered a verdict in favor of the Butlers, awarding compensatory damages to Oscar in the amount of $1,550,000 and to Dorothy in the amount of $250,000. Aggrieved, the defendants, collectively referred to herein as K.M. Leasing, now appeal the judgment rendered against them. The following issues are recited verbatim from K.M. Leasing's statement of the issues:
A. Whether the trial court erred in allowing purposeful racial discrimination in Jury Selection.
B. Whether the trial court erred in denying K.M. Leasing's Motions for Mistrial Based on the Butlers' violations of the trial court's Orders on Motions in Limine.
C. Whether the trial court erred in admitting certain expert testimony.
1. The trial court erred in admitting expert testimony on hedonic damages.
2. The trial court erred in allowing Brett Alexander to testify as an expert outside the scope of his expertise.
D. Whether the trial court erred in denying K.M. Leasing's Motion for New Trial or for Remittitur.
1. The jury's verdict, which fails to assess any negligence to Oscar Butler, reflects the jury's departure from its oath and is a result of bias, passion or prejudice.
2. The jury's verdict, which awards excessive damages to the Butlers, reflects the jury's departure from its oath and is a result of bias, passion or prejudice.
¶ 2. Finding no reversible error, we affirm.

FACTS
¶ 3. In the early morning before 6:00 a.m. on November 4, 1992, J.D. Frazier, a truck driver for K.M. Leasing, was driving south on Highway 49 when a large metal container suddenly fell from his tractor-trailer. The container fell into the right lane of Highway 49. After the container fell, Frazier got out of his truck, saw traffic approaching, took off his shirt and used it to wave traffic around his truck and the container. Frazier testified that he did not place any warning devices around the accident site after the container fell onto the highway. Soon after, Dempsey, also a driver for K.M. Leasing, drove by the accident site in her tractor trailer. After Dempsey passed through, Jimmy Hooks, who was parked at a nearby truck stop, drove up and parked his Ford Bronco behind the container, turned on his lights and flashers and got out to help flag traffic. Hooks waved four or five vehicles around the accident site. Shortly thereafter, Dempsey returned to the accident site to render assistance. Dempsey pulled her tractor trailer behind Hooks's Ford Bronco, put on her flashers and got out to help re-load the container. Frazier testified that Dempsey's truck hid the flashers on Hooks's Bronco. John Booth, a witness who observed the accident site before Butler collided, testified that he noticed Dempsey's flashers and lights were on, but the flashers were dim and could barely be seen. While Frazier and Dempsey were re-loading the container, Oscar Butler approached the scene in his eighteen wheeler and collided with Dempsey's vehicle.
¶ 4. As a result of the accident, Butler sustained a closed head injury and numerous broken bones resulting in medical bills totaling $161,000. Other facts relevant to *314 the resolution of the issues will be discussed under the designated issues.

ANALYSIS OF THE ISSUES PRESENTED

I. Purposeful Racial Discrimination in Jury Selection
¶ 5. In this appeal, K.M. Leasing raises a Batson[1] challenge and claims that Butler exercised all of his peremptory challenges to strike white jurors. K.M. Leasing's Batson argument is without merit.
¶ 6. We first note that K.M. Leasing did not raise the Batson challenge during jury selection. After voir dire and jury selection had ended, the record reflects that the trial judge sua sponte stated the following: "I'm going to let each side give their reasons for challenging these jurors." At neither this point nor at any point during jury selection had K.M. Leasing raised a Batson challenge. In response to the court's statement that the court was going to allow the parties to state into the record their reasons for the challenges just exercised by them, the Butlers offered the following:
BY MR. BOONE: All right. Your Honor, for juror number two, juror number two works for an engineering company. In the case a company is being sued, and we feel that juror number two may have concerns about companies being sued, and we just feel uncomfortable with her on that basis.
In addition, your Honor, sheeven though she works for a telephone company and hasshe's a technician, we think that some of the mathematical things that may come into play in this case, she may tend to exercise a little more influence over jurors, some jurors who may not have the background that she has.
But mainly she's working for a company, and a company is being sued and she would probably most likely
BY THE COURT: Doesn't every juror in here work for a company?
BY MR. BOONE: No. I don't think that's necessarily true. But, your Honor, thatthat's not true that every juror here works for a company. But we think with her working for particularly an engineering company, although it may be in the telephone company, there will be an engineer that will testify about the engineering of this dumpster that was on this trailer.
And I think that the Butlers can have a legitimate concern about whether or not that person may know some more engineering principles or have learned or read about engineering principles that other jurors would not.
BY THE COURT: Go ahead. Finish yours.
BY MR. BOONE: All right. Your Honor, on number three, Sherry Ingle, she is a registered nurse, she knows Dr. Thompson. And we just feel just the fact that she is a registered nurse and knows Dr. Thompson, a witness in this case, that that's not good and appropriate. And she also said she works with Dr. Thompson also.
And for number four, who isshe's currently employedexcuse me, her husband is currently employed for a transportation company similar to K.M. Leasing. And for number eight, Cheryl Vance, which is P-4, I believe she testified she's a member of the church of John Fike, who is one of the attorneys in this case.
¶ 7. It was only after the Butlers offered their reasons that K.M. Leasing voiced their so-called Batson concerns. The explanations were offered before any objection was raised by K.M. Leasing. Once *315 the Butlers offered their explanations for the strikes, the trial judge then asked K.M. Leasing to offer explanations for their strikes. K.M. Leasing declined to offer an explanation and additionally raised their concern as follows that the Butlers had struck jurors in violation of Batson and that the venire did not represent the racial make-up of the district:
BY MR. PAGE: Your Honor, may I respond to his position with regard to the strikes?
BY THE COURT: Yes.
BY MR. PAGE: Of course, the defendants would move that the entire venire be dismissed and a new venire reconstituted based on the fact that it is not will not representor present to these defendants a jury of their peers. I'm not sure exactly what the racial make-up of this district is, but for Mr. Boone to strike the only four white jurors that were in the panel makes it abundantly clear that that's his only reason. That's an improper reason. It deprives us of a fair jury with the jurors that are in the first two panels, and the Court ought to strike this venire and offer us a new panel to pick from.
Ms. Ruff, for example, his first strike, answered the questions all correctly. She didn't have any engineering background. She said that all she did was put things together. He didn't question her about any kind of mathematical expertise she might have had. The only thingthe only reason we submit that he struck Ms. Ruff is because she was the first white juror on the panel.
As to P-2, Ms. Ingle, because she knows Dr. Thompson, Dr. Thompson is the plaintiffs witness the plaintiffs treating physician, that's the first time I've ever heard of somebody getting struck because they knew somebody's witness for their side. I think that makes it very clear that the only reason she was struck was because she is white.
P-3, the third white potential juror, she said she didn't know anything about truck driving, that her husband does drive a truck for American Freight-ways, which is in no shape or form similar to the type business that Mr. Rhodes runs in Pearl, Mississippi hauling salvage or those type products. American Freight-ways is a huge trucking company. She wasn't even questioned about that. Butler was also a truck driver.
Then P-4, Cheryl Vance, I'm not sure what reasons he enunciated for striking her.
BY THE COURT: Mr. Fike, being a church member with Mr. Fike.
BY MR. PAGE: A church member. I think she saidI thought she said she went to church with someone else. It may have been the attorney, Fike, but that in and of itself is not a legitimate reason to strike a juror. I think it's clear, your Honor, on all four, there's not a race neutral ground given that has any kind of merit, and that the only reason he struck them is because they're white. And we move for a mistrial, or whatever the proper term would be, for this Court to offer us an opportunity to have a fair jury and have a fair trial.
¶ 8. After K.M. Leasing finished, the court ruled as follows:
BY THE COURT: I'm going to overrule the motion at this time with great concern to the Court, especially in the instance of the two jurors, Karen Ruff and Sherry Ingle. It's certainly a very large question as to why these jurors were struck by the plaintiffs attorney. It almost requires the Court toor almost leads the Court to only one conclusion, and that is that the race of the jurors was the motive for the striking of the jurors. He did give some reasons that certainly were less than persuasive.
The other side of that is that the Courtperemptory challenges are given. The Court doesn't want to remove from the attorneys the right to use their instincts in removing certain jurors. Of course, I understand that Batson does *316 state that it is a right of a person to serve as a juror if they are qualified, and they should not be removed for racial reasons. And this certainly is very marginal as far as the Court is concerned. And I'm not so sure the Court is not entitled to consider this question in view of what result the jury would reach in this case.
I'm going to allow the challenges to remain but with that caveat to the plaintiff. I certainly am not persuaded by his representation or his reasons for challenge.
¶ 9. Later on just before the court got ready to take up several motions in limine, the record sheds more clarity on what actually happened during the jury selection process. The record reflects the following:
BY THE COURT: Before we get into these motions I guess I better go on the record here concerning all of these representations that have been made about this Batson problem so that the record will be clear so that the appellate court will not have any trouble in deciphering what happened in the selection of the jury.
Initially 12 jurors were tendered to the plaintiff, of which juror number two and number three on panel one were white jurors. Those two jurors were challenged peremptorily by the plaintiff. That put jurors Franklin and Jamison on the jury panel, both of which were black jurors.
Twelve black jurors were tendered to the defendant. The defendant then challenged juror Betty Spann and juror Debra Spann which placed on the panel for the plaintiff's consideration Brenda Wade and Gwendolyn Robinson. The plaintiff at that time challenged the third white juror, Brenda Wade, leaving Gwendolyn Robinson and Lasonya Neal as the remaining jurors on the panel. Those 12 jurors were tendered to the defendant, all of which were black.
The defendant then challenged Robinson and Neal being his third and fourth challenges which exhausted the challenges of the defendant, and which placed Cheryl Vance on there as a white juror, which would have been the number 12 juror.
The plaintiff then exercised his fourth challenge on that white juror leaving the jury panel with no white jurors on the panel. At no time was there ever a white juror tendered to the defendant.
* * * *
BY MR. BOONE: Your honor, may we approach.
BY THE COURT: Yes.
(Bench Conference)
BY MR. BOONE: In an effort to bring this case to a complete close the plaintiff has tendered to the Court and to the defendant the right to have juror number two and juror number three which was peremptorily challenged by the plaintiff, that the plaintiff will now accept those jurors, if the Court would call them back or however, whatever procedure is appropriate.
So what this record should reflect is that the plaintiff has made an offer to accept juror number two and three, to which the plaintiffs continue to hold an opinion that they were peremptorily challenged on a non-racial basis, but that is an offer to try to resolve the problem.
BY THE COURT: The Court denied that request.
¶ 10. The above-quoted portions of the record compel the conclusion without doubt that K.M. Leasing never made a Batson challenge during the jury selection process. Instead, K.M. Leasing took advantage of the court-initiated request that the parties state on the record their reasons for the peremptory strikes and sought primarily to have the entire venire quashed while making a counter-argument to the reasons offered by the Butlers.
*317 ¶ 11. We note that Batson does not require that a venire or petit jury represent the racial make-up of the district from which the venire or jury is chosen. Batson simply prohibits the use of race-based peremptory strikes. In order to properly raise a Batson challenge, the objecting party must satisfy a three-step analysis. Under Batson, the party objecting to the peremptory challenge must first make a prima facie showing that race was the criteria for the exercise of the peremptory strike. Secondly, the burden then shifts to the party exercising the challenge to offer a race-neutral explanation for striking the potential juror. Finally, the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory strike. McFarland v. State, 707 So.2d 166, 171 (Miss.1997); Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).
¶ 12. Since there is no indication in the record that a Batson challenge was raised by K.M. Leasing during the jury selection process, the issue is waived. Shaw v. State, 540 So.2d 26, 27 (Miss.1989). In their motion for new trial, K.M. Leasing visited the issue again as follows:
The Court erred in failing to grant a mistrial during that stage of the jury selection process when it was evident that the venire was not a fair representation of the community or county and that Plaintiff was exercising preemptory (sic) challenges in violation of Batson v. Kentucky[,] 106 Set. R.[S.Ct.] 1712, 90[476] U.S. 79, 90 L.Ed.[2d] 69 (1986), Edmonson v. Leesville Concrete Company, Inc.[,] 111 S.Ct. 2077[, 500 U.S. 614, 114 L.Ed.2d 660] (1991) and other similar holdings which require a legitimate race neutral ground for any such challenge. At no time did the Plaintiff tender to the Defendants a jury panel which included any whites. At each instance, and at least on three different occasions, the Plaintiff tendered a jury panel consisting of twelve Blacks. Defendants on two occasions tendered one or more White jurors to the Plaintiffs, but the Plaintiff peremptorily challenged all of those White jurors tendered and struck them from the panel. Never did the Plaintiffs strike a single Black juror. Further, the Plaintiffs attorney was unable to verbalize race neutral grounds for the preemptory (sic) strikes exercised.
The empaneling of the jury under these circumstances deprived the Defendants of the
opportunity to be judged by their peers. Unfortunately, race was a central issue in the case inasmuch as the Plaintiffs were black and the target corporate Defendant was represented by a white male, and one of the two Defendant drivers was a white female.
This Court should take judicial notice of the fact that the racial make-up of Hinds County, excluding Jackson, Clinton and Terry is 55% White and 45% Black.
¶ 13. It is apparent that K.M. Leasing was targeting the entire venire and not the striking of specific jurors. Even if the objection had been properly raised, K.M. Leasing's argument still lacks merit. Great deference is given to the trial court in determining whether the offered explanation under the unique circumstances of the case is truly a raceneutral reason. McFarland, 707 So.2d at 172. We will not reverse a trial judge's factual findings on the Batson issue unless the findings appear clearly erroneous or against the overwhelming weight of the evidence. Id. We give great deference to the trial court on this matter because the demeanor of the attorney using the strike is often the best evidence on the issue of race-neutrality. Id. In addition to the demeanor, the trial court must consider all other relevant circumstances, such as the way prior peremptory strikes have been used and the nature of the questions on voire dire. Id. Further, when a race-neutral explanation is tendered, the process *318 does not demand an explanation that is persuasive or even plausible, so long as discriminatory intent is not inherent in the explanation. Purkett, 514 U.S. at 768, 115 S.Ct. 1769. We therefore defer to the trial judge's discretion under these circumstances.
¶ 14. In a final observation on this point, we note that the Butlers offered to unstrike or accept the jurors about which complaint is made. The trial judge refused the offer, and the record does not reflect any opposition on the part of K.M. Leasing to the court's refusal to accept the offer. Therefore, for this reason in addition to the reasons discussed already, we decline to find any error in the jury selection process.

II. K. M. Leasing's Motions for Mistrial Based on the Butlers' Violations of the Trial Court's Orders on Motions in Limine
¶ 15. K.M. Leasing filed motions in limine seeking to prevent the admission of evidence of Frazier's termination from K.M. Leasing and the unemployment hearing which emanated from that termination. The ruling on the motions was as follows:
BY MR. BAINE: Judge, this is an unemployment hearing. This is something that was
BY THE COURT: I'm going to exclude it, but I'll let him develop the evidence at the time you want to and I'll see if it would be admissible.
BY MR. BOONE: Right.
BY THE COURT: The motionat this point in time I will sustain the motion subject to you being able to develop your proof in that area.
BY MR. BOONE: Exactly.
BY MR. BAINE: Judge, we're to number 13 on page three, the reference to the fact that J.D. Frazier was terminated several months after this accident.
BY THE COURT: You'll certainly be entitled to develop that he doesn't work there anymore.
BY MR. BAINE: He doesn't work there anymore your Honor.
BY THE COURT: The fact that he was terminated would be something that would be excluded by the Court. Same ruling again. I mean, you know, making these decisions here in vacuum, I don't know if by some manner or means it will become relevant to the issues in this case or not, But at this point in time in this vacuum I'm sustaining that in limine.
¶ 16. K.M. Leasing claims that the Butlers elicited evidence in violation of the trial court's order sustaining K.M. Leasing's motions in limine. Specifically, K.M. Leasing claims that the Butlers wrongfully elicited testimony from Frazier regarding his statements made at an unemployment hearing. On re-cross the Butlers asked Frazier whether he had told anyone that the box had fallen from the truck because there was something wrong with the truck. Frazier denied making the statement, and the Butlers counsel responded with the following question: "Do you remember telling any judge that?" At that point, counsel for K.M. Leasing objected, a bench conference was held and after the conclusion of the bench conference, counsel for the Butlers asked, "Your answer is no?" The witness answered, "Right." No further objection was made by K.M. Leasing.
¶ 17. K.M. Leasing also contends that the following questioning of Frazier was improper and violative of the court's ruling on the motions in limine:
Q. Where are you employed now?
A. For Bedro Price.
Q. Bedro Price?
A. Bedro, B-e-d-r-o.
Q. When did you stop your employment with White Heavy Express?
A. I don't remember.
Q. Was it soon after the accident with Mr. Butler?
A. Yeah.

*319 Q. All right. Now, did you voluntarily leave?
BY MR. PAGE: You Honor, we object to that.
BY THE COURT: Sustained.
BY MR. PAGE: It's not relevant to that.
BY THE COURT: The objection will be sustained.
BY MR. PAGE: Your Honor, we're going to move for a mistrial too on the record.
BY THE COURT: All right. It will be overruled.
¶ 18. K.M. Leasing contends that these violations prejudiced and improperly influenced the jury, necessitating the need for a mistrial. We disagree. Whether an error is incurable resulting in a mistrial, rests within the sound discretion of the trial court. Snelson v. State, 704 So.2d 452, 456 (Miss.1997). We will reverse only when the trial court has abused its discretion in not granting the defendant's request for mistrial. Id.
¶ 19. K.M. Leasing further argues that when the jury heard the question to Frazier, followed by an objection, a motion for mistrial, and no answer, they would jump to the conclusion that Frazier had been fired because he caused the accident. We disagree. Only two questions were propounded regarding Frazier's termination before an objection was made. The objection was sustained, and K.M. Leasing did not request the trial court to admonish the jury to disregard the questions. Where an objection is sustained and no request is made that the jury be told to disregard the objectionable matter, there is no error. McGowan v. State, 706 So.2d 231, 242 (Miss.1997).
¶ 20. We also note from the record that during the hearing on the motions in limine, the trial court made a preliminary ruling only and explicitly reserved the right to revisit the issue should the evidence develop in a manner in which the court could conclude that the evidence from the employment hearing was relevant. Decisions concerning the relevance of evidence are in the broad discretion of the trial court. Terrain Enterprises, Inc. v. Mockbee, 654 So.2d 1122, 1131 (Miss. 1995). An appellate court will not reverse a trial court's decision unless an abuse of discretion is shown. Id. Under the circumstances presented, we find no abuse of discretion and the claim is without merit.

III. Admission of Expert Testimony
¶ 21. The admission of testimony is within the discretion of the trial court. Roberts v. Grafe Auto Co., Inc., 701 So.2d 1093, 1098 (Miss.1997). Unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion, the decision will stand. Id. K.M. Leasing contends that the trial court committed reversible error by allowing expert testimony on hedonic damages and by allowing an expert to testify outside the scope of his expertise.

A. Hedonic Damages Expert
¶ 22. K.M. Leasing does not argue that evidence of hedonic or "loss of enjoyment of life" damages is inadmissible, just that hedonics is not an accepted field of expertise in the economics discipline and that expert testimony on the subject is inadmissible because it is neither necessary nor beneficial to the jury in assessing damages in this area. At trial, K.M. Leasing objected to the admission of testimony from Stan Smith, the hedonic expert, not on the basis that hedonics is not an accepted field of expertise in economics but on the basis that the admission of such testimony would allow duplicative recovery, would be invasive of the province of the jury and would be of no aid to the jury as hedonics is not a field in which expert testimony "is either necessary or of aid to the jury." However, in their motion for new trial, K.M. Leasing did allege that hedonic damages are not recoverable in Mississippi. Therefore, we will address both the admissibility of hedonic damages as an element of damages in a personal injury action and the propriety *320 of allowing expert testimony in establishing such damages.
¶ 23. We can find no Mississippi case directly on point on the question of whether loss of enjoyment of life is an element of damages in a survival personal injury action. The Mississippi Supreme Court confronted this issue in the wrongful death context in Upchurch v. Rotenberry, 96-CA-01164-SCT, ___ So.2d ___, 1998 WL 718243 (Miss. Oct. 15, 1998). While the teaching on the issue in the wrongful death context was obiter dictum, we nevertheless find the discussion helpful in the resolution of the issues before us.
¶ 24. In Upchurch, Beverly Ann Upchurch, as parent and personal representative of the wrongful death beneficiaries of Timothy Adam Upchurch, sued Teresa Rotenberry for the wrongful death of Timothy who was a passenger in Beverly's vehicle when she lost control, veered off the road and hit a tree. Timothy received injuries which resulted in his death. Id. at ___ (¶ 7). During the trial, Dr. Brookshire, the plaintiffs expert on hedonic damages, was not allowed to give testimony, but the jury was allowed to consider them. Id. at ___ (¶ 35). The jury found for Rotenberry on the issue of liability; therefore, it was not necessary for the supreme court to reach the issue of damages. Nevertheless, the court did consider the damage issue, and in approving the trial court's decision not to allow Dr. Brookshire's testimony, the court noted:
While this issue is not one of first impression presented to this Court, there is very little case law available on the subject in our State. The available case law provides that this Court has not yet adopted hedonic damages, more commonly known as damages for the "loss of enjoyment of life."
"Mississippi law has not recognized hedonic damages in a wrongful death action despite a concurring opinion by Justice Robertson favoring such damages. Moore v. Kroger Co., 800 F.Supp. 429, 435 (N.D.Miss.1992) (citing Jones v. Shaffer, 573 So.2d 740, 744 (Miss.1990)).
* * * *
Testimony by Dr. Brookshire, the plaintiffs expert in the field, would only serve to confuse or mislead the jury, and the trial court was correct in denying expert testimony on the loss of enjoyment of life. The verdict of the jury reflects that in its view no hedonic damages were sustained by the appellant. Under the facts of this case, this "is not shocking to the judicial conscience." McGowan, 524 So.2d at 311.
While this Court has only addressed hedonic damages in a very limited fashion, other states have addressed this issue at length. In Michigan, for example, a District Court has held, "hedonic damages are only available [under Michigan Wrongful Death Act] to living plaintiffs who have been permanently injured such that they cannot enjoy life's pleasures." Brereton v. United States, 973 F.Supp. 752, 756 (E.D.Mich.1997) (emphasis added). In Brereton, the court held that "the Michigan Supreme Court would not read the Act so broadly as to allow recovery for `hedonic damages, or for any other post-death damages which a decedent's estate might claim." Id. (citing Kemp v. Pfizer, Inc., 947 F.Supp. 1139, 1145-46 (E.D.Mich.1996) (emphasis added)). Based on the law that is available on this issue together with the fact that there is no evidence that Adam Upchurch was ever conscious to experience any pain and suffering between the time of the accident and his death, hedonic damages, even if they were available in this State, were properly denied by the jury. "Even if a liberal construction of the MWDA would allow the award of hedonic damages as an element of pain and suffering, such damages would not occur until after an individual had suffered an injury which restricted or interfered with his or her enjoyment of life. This might be applicable in the *321 wrongful death context where the decedent suffered a debilitating injury which persisted for a period of time prior to death." Id. at 757. The facts of the case at bar do not support a finding such as this.
Upchurch at ____ (¶ 32-36).
¶ 25. Justice McRae dissented in Upchurch on the issue of liability and had this to say about the majority's discussion of damages and the pronouncement that the Mississippi Supreme Court had not yet adopted hedonic damages:
Having found that Rotenberry was not liable for Upchurch's death, the issue of hedonic damages should not have been addressed by the majority at this time. However, this Court has recognized the appropriateness of awarding damages for loss of enjoyment of life. Thomas v. Hilburn, 654 So.2d 898, 903 (Miss.1995). The wrongful death statute, provides that "the party or parties suing shall recover such damages allowable by law as the jury may determine to be just, taking into consideration all the damages of every kind to the decedent and all damages of every kind to any and all parties interested in the suit." Miss. Code Ann. § 11-7-13 (Supp.1998)(emphasis added). We have construed this statute as allowing heirs to recover a panoply of damages. "Compensation is not limited to actual damages and lost wages, but extends to pain and suffering of the deceased and his loss of enjoyment of life as well as the loss of his companionship and society." Hilburn, 654 So.2d at 903 (citing McGowan v. Estate of Wright, 524 So.2d 308, 311 (Miss.1988)(construing the language of Miss.Code Ann. § 11-7-13 (Supp. 1984))).
Upchurch at ____ (¶ 46).
¶ 26. We read Upchurch narrowly to hold only that hedonic or loss of enjoyment of life damages are not allowable in a wrongful death action absent some evidence that the decedent suffered a debilitating injury which persisted for a period of time prior to death and that in a proper case, evidence of loss of enjoyment of life damages might be admissible. We do not read Upchurch as limiting in any way the recovery of loss of enjoyment of life damages in a survival personal injury case. Upchurch, in our opinion, spoke only to wrongful death cases where death was immediate or instant. This is not our case. We reach this conclusion because evidence of loss of enjoyment of life damages was admitted by the trial judge in Upchurch, and the Mississippi Supreme Court addressed only the question of whether is was proper to disallow the expert testimony to assist in establishing the amount of damages. We also find persuasive, as Justice McRae pointed out in his dissent, that the Mississippi Supreme Court in Hilburn did opine that Miss.Code Ann. § 11-7-13, the wrongful death statute, allows loss of enjoyment of life as an element of damages. Hilburn, 654 So.2d at 903.
¶ 27. We therefore hold that the trial court did not err in allowing evidence of loss of enjoyment of life as a recoverable element of damages in this case. However, our conclusion that evidence of loss of enjoyment of life damages was properly admitted does not resolve the question as to the admissibility of expert testimony on this element of damages. We do not find Upchurch to be decisive on this issue because in Upchurch, the Mississippi Supreme Court's affirmance of the trial court's denial of expert testimony was premised on the fact that the facts of the case did not permit recovery of loss of enjoyment of life damages, and thus it was not error to exclude the expert. The propriety of expert testimony in establishing hedonic damages in a proper case was left unanswered in Upchurch.
¶ 28. While the weight of authorities who have considered this issue have concluded that expert testimony is inadmissible,[2] we *322 choose here to pretermit the issue and hold, for the reasons to be discussed below, that the admission of Stan Smith's testimony was harmless error even if it should not have been allowed.
¶ 29. Besides Butler's wife, six witnesses, including two orthopedic surgeons, a clinical psychologist, a physical medicine and rehabilitation specialist, a vocational rehabilitation counselor and an osteopath, testified for the Butlers. Each of these witnesses, including Butler's wife, painted a picture from which the jury could glean some competent evidence by which to judge the quality of life left to Mr. Butler after the accident, and ultimately by which to assess his damages for that loss. In order to demonstrate our point, we set forth the testimony of each of those witnesses in some length.
¶ 30. Dr. Terry Meadow, the emergency room physician, testified that when Mr. Butler arrived at the emergency room Butler was unresponsive and in critical condition. Butler's pupils were equal and he had heavy bleeding from the scalp and face. Butler also had contusions to the chest and abdomen. He had left forearm deformity, multiple lacerations to the extremities and a laceration to the bladder. He also suffered a concussion.
¶ 31. Dr. Jeff Kennedy, an orthopedic surgeon, also treated Butler in the emergency room. He treated Butler for both thigh bone and forearm fractures. To repair the thigh bone fracture he drove a stainless steel rod down the thigh bone through the center of the bone. He stated that parts of the thigh bone were blown apart. He placed a plate with six screws in Butler's forearm. He stated that the bone in the forearm was broken into many pieces. He also had a metacarpal fracture which was located in his little finger. They taped his fingers together in order to treat the fracture. Butler also had a small ankle crack which slowed him down.
¶ 32. Dr. William Thompson, another orthopedic surgeon, treated Butler for long bone injuries. He testified that the closed head injury affected Butler's ability to cooperate in physical therapy. Thompson stated that his office followed Butler with x-rays of his left arm and his right thigh bone. He checked them for healing and also examined Butler for range of motion in those extremities and encouraged him and instructed him on exercises and weight bearing status. Thompson rated Butler's left upper extremity and his right lower extremity. Thompson gave a permanent partial impairment rating of 20 % for the left upper extremity and 15 % to right lower extremity. Thompson testified that he encouraged Butler to go back to work because Thompson thought that working would help with Butler's orthopedic recovery. He stated that Butler returned to work with his old company as a fuel man; however, Butler was unable to maintain the job because of pain in his leg and because of behavioral and emotional problems.
¶ 33. Dr. Edward Manning, a clinical psychologist, first began treating Butler in December of 1992. Manning stated that in his initial report he reported that Butler was alert but confused and disoriented. He also reported that Butler had trouble with some basic historical facts as compared to his wife's recitation of those facts. Manning diagnosed Butler as suffering from neuropsychological perspective. Manning stated that Butler had considerable problems with some receptive, particularly expressive, language problems. He showed a great deal of difficulty with reasoning and problem solving tasks and, again, a great deal of difficulty for memory tasks. In addition, Manning thought Butler showed a diminished awareness for Butler's deficits. Manning stated that the brain injury had affected Butler's executive *323 functions, meaning his ability to interact with people.
¶ 34. Manning testified that he was of the opinion that Butler was not capable of driving at the time he treated him. Manning stated that after several years of treatment, Butler did improve; however, Butler still did not fully appreciate the difficulties he was exhibiting. Manning gave Butler a permanent cognitive impairment rating of 25% to 30 %. He assigned this rating because he thought Butler exhibited impairment with complex integrated cerebral functions. Manning also stated that Butler experienced some mild to moderate emotional disturbance when he was faced with stresses or demands.
¶ 35. Dr. Jo Lynn Polk, a physician in physical medicine and rehabilitation, treated Butler through November 1995 on a regular basis. Butler came to Polk complaining of pain in his back, discomfort in his right leg and left wrist. Polk noted in his record that Butler's wife stated that Butler had a hard time understanding, and this was related to his closed head injury. Manning stated that immediately after the accident Butler suffered from posttraumatic amnesia.
¶ 36. Dr. Polk stated that his initial prognosis was that Butler had "severe traumatic brain injury with residual profound cognitive deficit in areas of memory, judgment, and reasoning. And then my second impression was possible urinary tract infection that could be contributing to his back pain." Polk testified that Butler had a brain injury that resulted in "his inability to function as a full adult because he could not do things that we all do as adults. This was a direct consequence of his loss of adequate problem solving skills and reasoning skills, and this was a long-term effect from the initial injury. Butler still required the presence of someone to ensure his safety. Dr. Polk stated that it was his opinion that Butler did not have adequate appreciation of the severity of his injury and the subsequent problems associated with it. He also stated that Butler suffered from a traumatic brain injury and a sexual dysfunction.
¶ 37. Dr. Polk gave the final impairment rating. In determining the final rating, he relied on other doctors information and impairment ratings. He stated that he relied on Dr. Manning's and Dr. Thompson's information and impairment rating. He also used the American Medical Association Guide to the Evaluation of Permanent Impairment to arrive at his rating. Polk stated that in his opinion, Mr. Butler has a permanent impairment rating of the whole body of 57%. He stated that the approximate cause of the 57% rating was the traumatic brain injury Butler sustained in November of 1992.
¶ 38. Dr. Nathaniel Frentress was Butler's vocational rehabilitation counselor. He conducted an evaluation to see if Mr. Butler would be able to return to his work as a truck driver. Frentress reviewed the medical records and psychological records of Butler's head injury, arm injury and other body injuries. He also did some vocational testing to test Butler's ability to read, spell and do arithmetic to see if he could go into lighter jobs or be retrained. Frentress found that Butler read at a first grade level and that he was at a second grade level in arithmetic. On cross, Frentress admitted that he did not have a baseline from which to gauge Butler's abilities prior to the accident. However, Frentress found that Mr. Butler could not read and write well enough to handle clerical work or handle cashier work in a more sedentary occupation. Frentress testified that based on Butler's driving assessment on May 25th, 1995, Butler could not safely operate a motor vehicle. As a result of this test, the occupational therapist recommended an ophthalmology examination. Frentress also stated that, based on Butler's profile, Butler was not capable of being gainfully employed or working eight hours a day, five days per week to earn a living for himself and his family. He based this opinion on the fact that Butler was fifty-eight years old, had a fourth *324 grade education, could not read, write and do arithmetic, had experienced a significant brain injury and was restricted to two to four hours of work. He stated that Butler would not be able to gain employment in his area. He stated that Butler was totally disabled from gainful employment. Frentress estimated that Butler will require $39,423 in future care over his life expectancy.
¶ 39. Dorothy Butler testified that her husband drove trucks for thirteen or fourteen years. She testified that he loved driving and had not been able to drive since the accident. After finishing rehabilitation, all he wanted to do was drive. When he was told by his doctor that he would not be able to drive, he consequently sank into a deep depression. She stated that her son-in-law, who is a minister, would take him on drives in an effort to counsel him.
¶ 40. Mrs. Butler testified to the following changes in her and Mr. Butler's lives as a result of and following the accident:
 Mr. Butler's relationship with the grandchildren has changed. Normally, he would spend a lot of time with the children; now he only spends a couple of seconds with them;
 he was normally talkative; now he barely talks;
 before the accident Mr. Butler was the primary bread winner, but now she is the primary bread winner;
 before the accident he was in perfect health;
 he normally performed chores around the house and tinkered with his car, but now he does not have the desire to do so;
 during the first week of the accident, neither of them got any sleep. He also did not recognize his family while he was hospitalized;
 he had to have a sitter after the accident;
 the accident affected their sexual relationship;
 on a scale of 100, the accident affected 95% of their relationship.
¶ 41. Stan Smith, the hedonic damages expert, did not testify as to any precise damage figures. Instead, he testified concerning the methodology used by economists in the field of hedonics and showed how the methodology may be used by a fact-finder in attempting to assess loss of enjoyment of life damages. For example, he testified that if the fact-finder, using the methodology discussed, determined in this case that Butler had a 50% loss of enjoyment of life, the amount of damages would be $683,203 or if the fact-finder determined that Butler had a 66% loss of enjoyment of life, the amount of damages would be $910,932, and a 57% loss of enjoyment of life, the amount of damages would be $778,851. He was careful to state that he could not say and was not saying what percentage of loss of enjoyment of life Butler had suffered. He also made clear that the figures were just illustrative.
¶ 42. The jury was instructed that it may consider loss of enjoyment of life as a factor in determining the amount of damages to award. The special verdict interrogatory submitted to the jury did not have a breakout of damages according to each element. Ergo, the amount, if any, for this element was included in the overall general damage award.
¶ 43. Pharr v. Anderson, 436 So.2d 1357 (Miss.1983) is a case which is somewhat similar to the case at bar. In Pharr, the lower court allowed Dr. Oliver to testify about the loss the daughter suffered from not having the deceased mother as her caretaker. Id. at 1359. He estimated a gross amount of $560,000 over the life expectancy of the deceased. Id. Dr. Oliver, just as Stan Smith in the case at bar, testified that he did not suggest that the figures he gave should be applied in the case but that he was simply giving a broad guideline. Id. Even though the court deemed the testimony to be speculative *325 and improper, it concluded the testimony was harmless error. Id. The court stated that the amount of the verdict indicated that the jury was not influenced by the testimony. Id. We conclude in the case sub judice that Stan Smith's testimony was not indispensable to the verdict and that there was sufficient evidence aliunde which the jury could have properly based its verdict. Therefore, any error in allowing his testimony was without doubt harmless.

B. Accident Reconstruction Expert
¶ 44. K.M. Leasing argues that the trial court erred by admitting Brett Alexander's, the accident reconstruction expert, testimony with regard to the ability or inability to see taillights under various circumstances. After the Butlers tendered Alexander as an expert and after K.M. Leasing's voir dire of Alexander, K.M. Leasing requested that Alexander's expert testimony be limited to the field of reconstruction and to exclude any testimony on the ability or inability to see taillights. K.M. Leasing contends that Alexander was not qualified to testify on the visibility of taillights.
¶ 45. When expert opinion evidence is offered, the initial inquiry is whether the subject matter of the proffered testimony is of the sort that will assist the trier of fact. Hardy v. Brantley, 471 So.2d 358, 366 (Miss.1985). The next inquiry is to determine whether the witness sought to be presented is qualified as an expert by knowledge, skill, expertise, training or education. Id. Alexander's credentials are somewhat similar to K.M. Leasing's experts. Alexander has an undergraduate degree in criminal justice and owns a consulting firm which performs accident reconstruction work. Alexander went through training at the Hattiesburg Police Department which involved basic accident investigation work. Later, Alexander took courses sponsored by the state in advanced accident investigation. The advanced accident investigation course was a three-phase course which dealt with the separate phases in accident reconstruction. Also, Alexander is certified by the state of Mississippi as an accident reconstruction specialist. Additionally, Alexander attended accident reconstruction seminars sponsored by the Institute of Police Technology and Management. These courses involved forensic animation of traffic crashes and commercial accident investigation and inspection. Further, Alexander took several courses that dealt with night visibility and the human factor and perceptions. The human factor and perception course dealt with behavioral patterns and how objects function on the eye. The night visibility courses included headlight pattern analysis and new automotive lamp technology. Based on this training and experience, we are not persuaded that the trial court abused its discretion in allowing the full span of Alexander's testimony as an expert witness.
¶ 46. K.M. Leasing further contends that Alexander's testimony on taillight visibility invaded the province of the jury, that no special knowledge or expertise was needed to help the jury on the issue of whether the road film which covered the taillights affected visibility and thus contributed to the accident. Because testimony on this matter had already been presented to the jury through a lay fact witness, we find that Alexander's testimony on this issue, if error at all, was harmless error. John Booth, a lay witness, observed the entire incident. John Booth testified that he was parked 30 feet away from the scene at a nearby truck stop. He testified that he noticed that Dempsey's flashers and lights were on. Booth also stated that he could barely see the lights because of the road film which covered the lights. Additionally, K.M. Leasing's expert admitted that even though in his opinion the film did not affect Butler's visibility, film over lights does tend to reduce visibility. We fail to see how Alexander's additional comments about the film could have prejudiced the jury to the extent required for a reversal on this issue. Accordingly, *326 this assignment of error is without merit.

IV. K.M. Leasing's Motion for New Trial or for Remittitur

A. Motion for New Trial
¶ 47. The granting or denial of a new trial in a civil case is a matter committed to the sound discretion of the trial judge. Clayton v. Thompson, 475 So.2d 439, 443 (Miss.1985). Such motions should be granted sparingly and only when the trial judge is convinced that the jury has wholly departed from its oath to follow the law and has been actuated by bias, passion and prejudice. Id. We will reverse the trial court's decision on a motion for new trial when such decision reflects an abuse of discretion. Shields v. Easterling, 676 So.2d 293, 298 (Miss.1996). K.M. Leasing contends that they produced ample evidence to find negligence on the part of Butler. They further argue that since the jury failed to assess any negligence, the jury must have been influenced by bias, passion and prejudice. K.M. Leasing argues that Alexander's testimony, Smith's testimony, and the violations of the motion in limine were specific examples in which the jury was prejudiced against them. We disagree. As we have previously stated, any error in allowing the testimonies of Alexander and Smith on the points urged by K.M. Leasing was indeed harmless error, evincing no prejudice to K.M. Leasing.
¶ 48. As to the jury's determination that Butler was not the sole proximate cause or a contributing proximate cause of the accident, there is more than sufficient evidence to support the jury's verdict. Sufficient evidence was established to show that K.M. Leasing, Frazier and Dempsey were negligent in proximately causing the accident. The evidence established that the container fell due to the improper maintenance of the truck and its equipment, and also from the failure to adequately secure the container to the trailer. The evidence further established that Frazier and Dempsey failed to put out any warning devices.
¶ 49. K.M. Leasing argues that the evidence established that Butler did not attempt to apply his brakes until about thirty feet before the point of impact, although the taillights and flashers of Dempsey's vehicle were on. They further argue that the evidence established that the lights could be seen from 100 feet away. K.M. Leasing also presented experts which stated that the accident site could be seen from as much as 2100 feet away, despite the road film on the lights. Another expert testified that motorists should have been able to detect the presence of the vehicles and safely avoid the collision. K.M. Leasing contends that the evidence established that several vehicles did in fact pass around all of the vehicles without mishap. However, competent testimony was produced which showed that the flashers on Dempsey's truck were dim, dirty and could not be seen from thirty feet in a stopped vehicle. Further, testimony was produced that established the fact that no one was directing traffic at the time that Dempsey parked her trailer behind Hooks's truck. It was for the jury to resolve the conflicts and disputes in testimony. This the jury did, and there is ample evidence to support the verdict in behalf of the Butlers. Therefore, we hold there is no merit to this issue.

B. Remittitur.
¶ 50. The general rule is that a damage award may be altered or amended only when it is so excessive that it evinces passion, bias and prejudice on the part of the jury so as to shock the conscience. Roussel v. Robbins, 688 So.2d 714, 724 (Miss.1996). Motions seeking a remittitur are committed to the sound discretion of the trial judge. Id. Where the trial judge acts upon these matters, we reverse only if he has abused or exceeded his discretion. Id. Having previously found that K.M. Leasing's claims lack merit, we conclude the damages awarded are not so excessive that they evince passion, bias and prejudice *327 on the part of the jury so as to shock the conscience. The trial court did not abuse his discretion; therefore, the award will be allowed to stand.
¶ 51. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IN FAVOR OF OSCAR LEE BUTLER, SR., BY AND THROUGH HIS CONSERVATOR, DOROTHY BUTLER AND DOROTHY BUTLER, INDIVIDUALLY, TOTALING $ 1.8 MILLION IS AFFIRMED. STATUTORY DAMAGES AND INTEREST ARE AWARDED. ALL COSTS OF THIS APPEAL ARE TAXED AGAINST K.M. LEASING, INC., D/B/A WHITE HEAVY EXPRESS, J.D. FRAZIER, INDIVIDUALLY AND IN HIS CAPACITY AS AN EMPLOYEE OF K.M. LEASING, INC., D/B/A WHITE HEAVY EXPRESS AND DEBORAH S. DEMPSEY, INDIVIDUALLY, AND IN HER CAPACITY AS EMPLOYEE OF K.M. LEASING, INC., D/B/A WHITE HEAVY EXPRESS AND JOHN DOE.
KING, P.J., BRIDGES, DIAZ, LEE, PAYNE, AND THOMAS, JJ., CONCUR. McMILLIN, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SOUTHWICK, P.J., AND MOORE, J.
McMILLIN, C.J., dissenting:
¶ 52. I respectfully dissent. In my view, it was reversible error to permit Stan Smith to testify as an expert in the field of quantifying damages arising out of Butler's loss of enjoyment of life, an element of damages commonly referred to as "hedonic damages." As I understand the majority's view, there is no real dispute that Smith's evidence ought to have been excluded. The majority simply takes the position that the error in admitting Smith's testimony was harmless. In light of the facts that (a) Smith's testimony was clearly inadmissible, (b) Smith offered evidence suggesting that Butler suffered hedonic damages in a range of $683,203 to $910,932 separate and apart from other damages related to medical expenses, lost wages, and pain and suffering, (c) the trial court specifically instructed the jury that it could consider hedonic damages as a separate element of damages, and (d) Butler was awarded total damages of $1,550,000, I cannot agree that Smith's testimony can be brushed aside as harmless evidentiary clutter in the record of an otherwise acceptable trial.
¶ 53. We must, after all, assume that the jury followed the trial court's instructions. Singing River Mall Co. v. Mark Fields, Inc., 599 So.2d 938, 943 (Miss.1992). There was substantial evidence suggesting that the quality of Butler's life has been substantially diminished by virtue of the debilitating nature of his permanent injuries. Therefore, it is only reasonable to assume that some significant portion of the verdict represented compensation for the "loss of enjoyment of life" specifically mentioned in the trial court's instructions. I find it improbable in the extreme that Smith's testimony, bearing as it did directly on those damages and, insofar as the jury understood, carrying with it the trial court's imprimatur of reliability, did not substantially affect the amount of the jury's verdict. It is not an answer to that contention to say that the evidence of the severity of Butler's injuries was sufficient to support a verdict of this magnitude even without Smith's inadmissible evidence. That is akin to permitting the jury to hear evidence of hundreds of thousands of dollars of medical expenses that were not related to the plaintiffs injuries and dismiss such a fundamental error in the conduct of the trial by concluding that competent evidence of other components of damage could arguably support a verdict of the magnitude under consideration.
¶ 54. Smith was offered as an expert in the field of economics and was allowed to testify, over the defendants' objection, about a formula he had devised that he claimed would permit the jury to quantify with a high degree of precision those hedonic damages suffered by Butler. *328 Smith's testimony began with an expression of his opinion that society assigns, indirectly but in quantifiable ways, a monetary value to a typical person's life, which he said was roughly $3,000,000. Smith testified that this average person's age, for purposes of his analysis, was 32 years and that, by dividing the $3,000,000 by the number of years remaining in this hypothetical person's life, the value of one year of an average person's life could be determined. From there, Smith expressed the view that the plaintiffs life expectancy at the time of an injury could be determined from actuarial studies and that this figure, expressed in years, if multiplied by the previously-determined value placed by society on one year of a typical person's life would produce a figure reflecting the value of the plaintiffs remaining life. At that point, according to Smith, the jury would need only to determine what percentage of the plaintiffs enjoyment of life was permanently destroyed by the residual effects of his injuries, and apply that percentage to the total economic value of the plaintiffs remaining life to arrive at an accurate figure of the damages suffered for the plaintiffs diminished enjoyment of the normal pleasures of living.
¶ 55. Smith then proceeded to make such calculations for the jury using two percentages for the diminished quality of Butler's life. At a figure of 50% diminished capacity to enjoy life, Smith demonstrated that Butler's hedonic damages would calculate to be $683,203. Smith then used the figure of 66% to arrive at estimated hedonic damages of $910, 932. At the prompting of Butler's attorney, Smith made the calculation on the basis of Butler having lost 57% of his ability to enjoy a normal life (which figure, it seems fair to assume, was suggested by medical evidence that Butler had suffered a 57% percent medical disability to the body as a whole), and arrived at the figure of $778,851 in hedonic damages.
¶ 56. I would hold such evidence to be inadmissible. It purported to be expert evidence admissible under Mississippi Rule of Evidence 702. This rule permits a qualified expert to testify "in the form of an opinion or otherwise," but only if the expert is in possession of "specialized knowledge [that] will assist the trier of fact to... determine a fact in issue". M.R.E. 702. Smith's testimony cannot pass muster for admissibility under this rule.
¶ 57. In my view, Smith's unsupported notion that an average life is worth $3,000,000 is not, insofar as this record reveals, anything other than Smith's own opinion based on an unexplained and undocumented hodgepodge of calculations having some tenuous connection to (a) the relative cost of various safety devices such as smoke detectors, seat belts, air bags, and annual medical checkups when compared to the estimated number of lives saved by the use of such devices; (b) governmentally-dictated spending in such areas as consumer product safety, education of cigarette smokers, and airline safety procedures; and (c) the relatively higher salary that a particular occupation can command based on the physical danger inherent in pursuing that occupation as opposed to some less dangerous work.
¶ 58. Smith's theory of valuation of human life has been almost universally rejected by courts throughout the country when offered as a beginning point on the road to calculating a suitable figure for hedonic damages. In support of that contention, I attach as an appendix to this opinion a listing of cases from nine other jurisdictions that have found Smith's theory for quantifying hedonic damages inadmissible.
¶ 59. None of Smith's figures, even making the unwarranted assumption that they actually measured the economic value to be assigned to an average person's general enjoyment of life, were ever tied to the plaintiffs particular situation. The calculation of damages in a personal injury claim is a difficult process, incapable of precise measurement. In the related field of quantifying pain and suffering, the Mississippi *329 Supreme Court has conceded that "[t]here is no exact standard by which to determine the amount of damages to be awarded for pain and suffering...." Biedenharn Candy Co. v. Moore, 184 Miss. 721, 186 So. 628, 630 (1939). Damages of this sort, inherently unquantifiable by any known objective yardstick, depend on a myriad of factors that are, in almost every instance, peculiar to the situation of the particular plaintiff involved. The most notable aspect of Smith's purported scientific analysis, ostensibly offered to assist the jury in its deliberations, is that it completely ignores all the unique factors of the party's particular situation that make the award of damages a difficult, yet necessary, task for the jury to perform unaided by much more than its collective common sense, life experiences, and good judgment. Yet, by its introduction to the jury under the guise of "expert testimony," this essentially irrelevant information about some nameless, faceless imaginary person has every potential to confuse and mislead the jury as to its actual role in assessing the limits of the plaintiff's damage. Smith's evidence, if relied upon by the jury, would eliminate any meaningful effort by the jury to assess as best it can the damages due a particular plaintiff. In the place of the jury's deliberations, Smith would substitute the result of a simplistic mathematical computation of dubious validity performed on a large sum of money having no demonstrable connection to the economic value of any actual person's life. Under Smith's proposed methodology, the jury's entire role in computing this aspect of the plaintiff's damages would consist of assigning a percentage to the diminished quality of the plaintiff's post-injury life and then performing a mathematical calculation on figures previously determined, not by the jury, but by Smith himself. It is no understatement, in my view, to say that Smith's formulations substantially invade the province of the jury.
¶ 60. It should be understood that I am not suggesting that it was error to permit the jury to consider the diminished enjoyment of life that was traceable to the lingering effects of Butler's injuries in setting his damages. There is room for debate as to whether these hedonic damages are, indeed, a separate element of damage or are merely one aspect of a plaintiff's pain and suffering. See, e.g., Loth v. Truck-A-Way Corp., 60 Cal.App.4th 757, 70 Cal.Rptr.2d 571, 575 (1998) ("Loss of enjoyment of life ... is only one component of a general damage award for pain and suffering."), but see Mariner v. Marsden, 610 P.2d 6 (Wyo.1980) (permitting separate awards for (a) pain and suffering and (b) loss of enjoyment of life.). That is an issue presently unresolved in Mississippi. See Upchurch v. Rotenberry, 96-CA-01164-SCT (¶ 36), 1998 WL 718243, *10, ___ So.2d ___, ___ (Miss. Oct.15, 1998). It is also a question that is not directly before us in this case and it is unnecessary to resolve it in order to determine that this case must be reversed. The error in the case before us is that, even assuming that the jury could properly consider hedonic damages as a separate element of damage, the jury was permitted to hear extensive purported "expert testimony" as to how those damages might be calculated, when the only possible contribution that evidence could make to the jury's deliberations was to mislead and confuse them as to their proper responsibilities.
¶ 61. The issue presented to us for decision was whether Smith's testimony qualified for admissibility as legitimate expert testimony under Mississippi Rule of Evidence 702. I would answer that question in the negative and I would conclude, beyond doubt, that the admission of such evidence was so prejudicial to a fundamentally fair adjudication of the issue of damages as to require reversal of this jury verdict.
¶ 62. I would reverse and remand for a new trial limited to damages at a trial in which no expert testimony would be presented suggesting that future loss of enjoyment of life is capable of being *330 measured by mathematical computations performed on statistical compilations purporting to ascribe a precise economic value to some nonexistent "average" person's capacity to enjoy life.
SOUTHWICK, P.J., AND MOORE, J., JOIN THIS SEPARATE WRITTEN OPINION.

APPENDIX
1. In Mercado v. Ahmed, 756 F.Supp. 1097 (N.D.Ill.1991), the district judge found that Stan Smith's proposed testimony, essentially similar to that admitted in the case now before us, was inadmissible as lacking general acceptance of the validity of his methods among economists.
2. In Longman v. Allstate Ins. Co., 635 So.2d 343 (La.Ct.App.1994), the Louisiana Court of Appeals upheld the trial court's decision to exclude Stan Smith's proposed testimony purporting to quantify the value of the plaintiff's loss of enjoyment of life, agreeing with the trial court that Smith did "not rely upon a well-founded methodology in reaching his assumptions." Id. at 354. The appellate court said, additionally, that "economic theories which attempt to extrapolate the `value' of human life from various studies of wages, costs, etc., have no place in the calculation of general damages." Id.
3. In Sullivan v. United States Gypsum Co., 862 F.Supp. 317 (D.Kan.1994), the court excluded Stan Smith's proposed evidence calculating mathematically the damages arising out of loss of enjoyment of life, saying that "such damages are, by their very nature, not amenable to such analytical precision," and that the court did "not believe that such testimony would be helpful to the jury." Id. at 321.
4. In Scharrel v. Wal-Mart Stores, Inc., 949 P.2d 89 (Colo.Ct.App.1997), the trial court permitted an economist to testify as to the quantification of hedonic damages in a personal injury case using a theory essentially identical to that advanced by Stan Smith. The Court of Appeals reversed the damage award and remanded for a new trial on damages, saying "the economist's testimony did not assist the jurors in determining a matter outside their knowledge or common experience and thus was not admissible under CRE 702." Id. at 92.
5. In Kurncz v. Honda North America, Inc., 166 F.R.D. 386 (W.D.Mich.1996), the trial court excluded Stan Smith's proferred testimony purporting to quantify a personal injury victim's loss of enjoyment of life using methods identical to those used in the case now before this Court, concluding that "Mr. Smith's method and arrival at a number or range of numbers invites the jury to abandon its own perceptions of what is important to the particular case and its value in favor of guess-work as to how much his figures have already taken those factors into consideration." Id. at 390.
6. In Anderson by and through Anderson/Couvillon v. Nebraska Dep't of Social Services, 248 Neb. 651, 538 N.W.2d 732 (1995), the appellate court reversed a verdict rendered in a bench trial because of the trial court's reliance on Smith's testimony quantifying hedonic damages. The appellate court found Smith's methodology to be "flawed" and further noted, that since it consisted solely of compilations of the views of others as to the value of human life (as expressed in their buying decisions, employment decisions, and decisions as government regulators), even were Smith's figures shown to have any particular validity, they would still only represent a consensus of a large number of other individuals having no greater expertise in valuing human life than that possessed by the jurors themselves. Id. at 744.
7. In Loth v. Truck-A-Way Corp., 60 Cal.App.4th 757, 70 Cal.Rptr.2d 571 (1998), the appellate court found reversible error in the admission of Smith's testimony in a personal injury action, saying that "[t]he jury must impartially determine pain and *331 suffering damages [which the court had already found to include hedonic damages] based upon evidence specific to the plaintiff, as opposed to statistical data concerning the public at large." Id. at 576. The court went on to say that "[t]he only person whose pain and suffering is relevant in calculating a general damage award is the plaintiff. How others would feel if placed in the plaintiff's position is irrelevant." Id.
8. In Wilt v. Buracker, 191 W.Va. 39, 443 S.E.2d 196 (1993), the appellate court concluded that it was error to admit expert testimony of Dr. Michael Brookshire, an economist who ascribes to theories indistinguishable from Stan Smith's. That court, after first commenting that the assumptions supporting Brookshire's calculations "appear to controvert logic and good sense," said "we conclude that the loss of enjoyment of life resulting from a permanent injury is part of the general measure of damages flowing from the permanent injury and is not subject to an economic calculation." Id. at 205 and 207.
9. In Saia v. Sears Roebuck and Co., 47 F.Supp.2d 141 (D.Mass.1999), the trial court excluded Smith's proferred testimony on hedonic damages in a personal injury action, saying that "[f]inally, and perhaps most importantly, the court finds that Dr. Smith's testimony will not assist the jury in understanding the evidence or determining any fact in issue." Id. at 149. The court went on to say that "[a]t bottom, the court believes that the qualitative and quantitative value of the loss of Saia's enjoyment of life, as it might be included in the pain and suffering he may have endured, can be calculated independently by the jury without the assistance, if not the confusion, of Dr. Smith's proferred testimony." Id. at 150.
NOTES
[1] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) prohibits racial discrimination in jury selection.
[2] See, for example, Mercado v. Ahmed, 756 F.Supp. 1097 (N.D. Ill.1991), aff'd, 974 F.2d 863 (7th Cir.1992); Fetzer v. Wood, 211 Ill. App.3d 70, 155 Ill.Dec. 626, 569 N.E.2d 1237 (1991); Hein v. Merck & Co., Inc., 868 F.Supp. 230 (M.D.Tenn.1994); Foster v. Trafalgar House Oil & Gas, 603 So.2d 284 (La.Ct. App.1992).