# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CA-00598-SCT

*THE STATE OF MISSISSIPPI, BY AND
THROUGH DELBERT HOSEMANN, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF
STATE AND TRUSTEE OF THE PUBLIC
TIDELANDS TRUST*

*v.*

*KENNETH F. MURPHY, RAY J. MURPHY AND
AUDIE R. MURPHY*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/19/2015 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| TRIAL COURT ATTORNEYS: | PAUL R. SCOTT |
| | HUGH D. KEATING |
| | MELISSA WINFIELD |
| | DONALD J. RAFFERTY |
| | JE'NELL B. BLUM |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | HUGH D. KEATING |
| | JE'NELL B. BLUM |
| | JONATHAN P. DYAL |
| | K.C. HIGHTOWER |
| | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LEE DAVIS THAMES, JR. |
| ATTORNEYS FOR APPELLEES: | PAUL R. SCOTT |
| | ROBERT E. QUIMBY |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 10/27/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

EN BANC.

WALLER, CHIEF JUSTICE, FOR THE COURT:

¶1.     The State of Mississippi entered into a Public Trust Tidelands lease with the City of Bay St. Louis to build a municipal harbor on beachfront property in the City.  After the City began construction of the harbor, Kenneth F. Murphy, Ray J. Murphy, and Audie Murphy filed an inverse condemnation action, claiming that the State and the City had taken and damaged their property without compensation.  The case was tried in Hancock County Circuit Court, and a jury ultimately found the State liable to the Murphys for $644,000 in damages. The State now appeals.  Finding no error, we affirm the jury's verdict.

## FACTS & PROCEDURAL HISTORY

¶2.     This litigation arises from a dispute between brothers Ray, Audie, and Ken Murphy ("the Murphys"), and the State of Mississippi[1] and City of Bay St. Louis over the ownership of beachfront property located within the City. The property is comprised of two adjoining parcels situated on parts of Lots 2 and 4 in the Second Ward of the City of Bay St. Louis, Hancock County, Mississippi.[2]  The property is bounded to the west by Beach Boulevard (formerly Front Street) and to the east by the Bay of St. Louis, generally speaking.  The *exact* eastern boundary of the property is the subject of the litigation.

### Legal Description and History of the Property

¶3.     The record in this case contains deeds dating back to 1905 for Lot 4 and 1924 for Lot 2. The 1905 deed to Lot 4 describes the relevant boundaries of the property as follows:

---

[1] The State is represented by the Secretary of State's Office in its official capacity as the trustee for the Mississippi Tidelands Public Trust.

[2] We will refer to the Murphys' property as a whole as "the property."  When necessary, we will refer to the individual parcels separately as "Lot 2" and "Lot 4."

> Beginning at an iron rod at a point [illegible] of the North boundary line of the [illegible] on a course South 70° East intersecting the East line of Front Street, thence South 70° East eighty one and five tenths feet more or less to an iron rod at average high water tide on the Western bank of the Bay of St. Louis; thence South 29° 25' West sixty four and seven tenths feet (64.7 ft.) to an iron rod; thence North 70° West eighty-one and five tenths feet (81.5 ft.) more or less to a stake on the Eastern line of Front Street, thence North 29° 25' East along the Eastern Line of said Front Street sixty four and seven tenths feet (64.7 ft.) to the place of beginning.

The 1924 deed to Lot 2 contains a similar description of the relevant boundaries:

> Having a frontage on the eastern line of Front Street of sixty four and forty two hundredths (64.42) feet, more or less and extending back thence between parallel lines, running on a course south seventy (70) degrees east, a distance of eighty one and five-tenths (81.5) feet, more or less, to the water's edge of the Bay of St. Louis[.]

Between 1915 and 1917, a concrete seawall ("the Old Seawall") was built along oceanfront property in Bay St. Louis, including Lots 2 and 4. The Old Seawall is depicted in the first (and only) official plat of the City of Bay St. Louis, which was completed by E.S. Drake in November 1922 ("the Drake Plat"). On the Drake Plat, the property lines for Lots 2 and 4 extend beyond the Old Seawall.[3]

¶4.　　The legal descriptions of Lots 2 and 4 have changed over time. In 1932, A.A. Kergosien conveyed Lot 2 to his wife by warranty deed and altered the legal description of the property so that the north and south boundary lines ran "81.5 feet, more or less, *or* to the water's edge," rather than "81.5 feet, more or less, to the water's edge[.]" This change appears in later deeds conveying Lot 2. In addition, deeds to Lot 4 began incorporating the

---

[3] The measurements of the property lines depicted on the Drake Plat were calculated by the plaintiff's expert witness K.F. Boackle at trial. The Drake Plat does not contain boundary measurements for most properties.

Drake Plat as early as 1948, when Joseph Mauffray conveyed the southern thirty-two feet of Lot 4 to Alden Mauffray based on the following description: "The South 32 feet of Lot No. 4 of the Second Ward of the City of Bay St. Louis, as per the official plat of said City made by E.S. Drake, Civil Engineer, on file in the office of the Clerk in the Chancery Court of Hancock County, Mississippi." No metes-and-bounds description for Lot 4 exists in these deeds.

**The Murphy family acquires the property.**

¶5.     The Murphy family acquired the property in question through three separate transactions. First, in 1983, the Murphys' mother and stepfather each acquired an undivided one-half interest in the southern 35.7 feet of Lot 4. In 1989, Ray, Audie, and three other family members acquired Lot 2. Finally, in 1994, Audie Murphy acquired the remaining northern portion of Lot 4 via warranty deed. In 1999, Ray acquired sole ownership of Lot 2 from the other owners via quitclaim deed. Property tax maps admitted at trial reveal that Hancock County taxed the Murphys for property extending well beyond the Old Seawall.

¶6.     The Murphy family used the property in question to run a beachfront restaurant called Dan B's, or Daniel's South Beach Restaurant & Bar ("the Restaurant"). The Murphys bought the Restaurant from their parents in 2004.  A set of stairs was built over the Old Seawall to give the Restaurant's customers easier access to the beach, and the Murphys eventually constructed a sixty-foot deck onto the back of the Restaurant that extended beyond the Old Seawall and onto the beach. The Restaurant was destroyed by Hurricane Katrina in 2005, and the Murphys never rebuilt it.

¶7.	In 2004, Ray received a loan from Weldon and Loretta Frommeyer and conveyed a fifty-one percent interest in Lot 2 and the northern portion of Lot 4 to them as collateral. The Frommeyers quitclaimed the property back to Ray when he paid off the loan in 2007. In 2009, the Murphys' mother and stepfather conveyed the southern portion of Lot 4 to the Restaurant. Finally, in December 2011, the Restaurant conveyed the southern portion of Lot 4 to Ray, Audie, and Ken. At the same time, Ray conveyed Lot 2 and the northern portion of Lot 4 to himself, Audie and Ken. In sum, the Murphys had acquired title to all of the property in dispute by December 2011.

**The Clarke Survey**

¶8.	In 2001, Ray executed a "Specific Power of Attorney" appointing his son Darrell Murphy "my true and lawful agent and attorney-in-fact" and authorizing him to "contract for the sale of, sell, convey and warrant upon such terms and conditions and under such covenants as he shall think fit," Lots 2 and 4. Acting under this authority, Darrell ordered a survey of Lots 2 and 4, which was conducted by James Clarke. According to the testimony at trial, the Clarke Survey is the only survey that was conducted on the property prior to the commencement of the instant litigation. The Clarke Survey significantly changed the legal descriptions of Lots 2 and 4, apparently to account for the accretion of almost two hundred feet of fastlands east of the Old Seawall. The Clarke Survey provides the following legal description for the property:

> Part of Lot 2, Second Ward, City of Bay St. Louis, Ms., as per Drake's Plat of May 1, 1923 and more particularly described as: beginning at the intersection of the extension of the south margin of Main St. and the east margin of Front St.; thence S 34° 03' 16" W along said east margin 1.73 ft. to the point of

5

beginning; *thence S 70° 00' 18" E 77.80 ft. to the concrete seawall; thence continue S 70° 00' 18" E 191.72 ft., more or less, to the mean high water line of the Bay of St. Louis*; thence S 37° 44' 58" W along the meandering of said mean high water line of the Bay of St. Louis 48.74 ft., more or less; *thence N 69° 35' 16" W 181.24 ft., more or less, to the concrete seawall; thence continue N 69° 35' 16" W 85.04 ft. to the east margin of Front St.*; thence N 34° 37' 38" E along said east margin 45.97 ft. to the point of beginning.

Part of Lots 2 & 4, Second Ward, City of Bay St. Louis, Ms., as per Drake's Plat of May 1, 1923 and more particularly described: commencing at the intersection of the extension of the south margin of Main St. and the east margin of Front St.; thence S 34° 03' 16" W along said east margin 1.73 ft.; thence continue along said east margin S 34° 37' 38" W 46.97 ft. to the point of beginning; *thence S 69° 35' 16" E 181.23 ft., more or less, to the mean high water line of the Bay of St. Louis*; thence S 37° 44' 57" W along the meandering of said mean high water line 47.84 ft., more or less; *thence N 69° 28' 20" W 171.09 ft. to the concrete seawall; thence continue N 69° 28' 20" W 90.58 ft. to the east margin of Front St.*; thence N 31° 09' 35" E along said east margin 28.74 ft.; thence continue N 34° 37' 38" E along said east margin 17.24 ft. to the point of beginning.

The Clarke survey was incorporated by reference in all subsequent deeds among the Murphys.

**The Murphys' Attempts to Lease Property Beyond the Old Seawall**

¶9.    The record reveals that, on two separate occasions, the Murphys attempted to lease property beyond the Old Seawall from the Secretary of State. First, in 1996, the Murphys filed an application to lease property beyond the Old Seawall for the purpose of building a hotel development on the water. However, after a negative feasibility study, the Murphys ultimately abandoned this project. Margaret Bretz, an attorney in the Public Lands division of the Secretary of State's Office, wrote a letter in response to the Murphys' application noting that the State "would not have been able to offer a lease of the adjacent tidelands for the hotel site." At trial, Ken explained that they had intended to build a pier from the hotel

6

out into the water. He testified that his intent was to lease bottomlands from the State and did not intend to request a lease for property that his family owned, but that "[p]robably . . . I didn't know what I was doing."

¶10. In 2009, the Murphys filed a second application to lease property east of the Old Seawall for the purpose of rebuilding the deck that had been attached to the Restaurant. The Murphys' application indicated that the deck would "be used in conjunction with the operation of our restaurant." Notably, the survey attached to the Murphys' application indicates that the deck was to be built on property either currently or previously owned by the Murphys. The record does not reveal what become of this application.

**The Alleged Taking**

¶11. As stated previously, the Murphys did not rebuild the Restaurant after it was destroyed by Hurricane Katrina. Beginning in 2009, the United States Army Corps of Engineers constructed a new seawall ("the New Seawall") in Bay St. Louis east of the Old Seawall, which also had been destroyed by Hurricane Katrina. The New Seawall did not block the Murphys' access to or view of the beach. Then, on April 6, 2011, the State executed a rent-exempt Public Trust Tidelands lease to the City for approximately forty-four acres of property east/seaward of the Old Seawall for the purpose of building a municipal harbor. The portion of the Murphys' property that allegedly extends east of the Old Seawall was included in the property leased to the City. The lease names the State as the owner and lessor of the property. On January 3, 2012, the City began construction of the harbor.

**The Instant Litigation**

¶12.    On April 13, 2012, the Murphys filed a complaint for inverse condemnation in the Hancock County Circuit Court against the State and the City,[4] arguing that the State and the City had taken and damaged their property east/seaward of the Old Seawall. In response to the Murphys' complaint, the State filed a motion to dismiss, or alternatively, for summary judgment, arguing that the Murphys could not bring an action for inverse condemnation because they did not own any property beyond the Old Seawall. The State also argued that the Murphys were barred from claiming ownership of property east of the Old Seawall because they never challenged the public trust tidelands boundaries set by the Secretary of State in 1994. Finally, the State argued that the Murphys could not recover damages for the loss of their littoral rights as upland property owners. The trial court denied the State's motion, finding that the evidence in the record did not conclusively establish the boundaries of the Murphys' property or the adjacent public trust tidelands boundary.

¶13.    The case was tried before a jury in August 2014. At the conclusion of the trial, the jury returned a verdict finding the State liable for taking and damaging the Murphys' property and awarding the Murphys $644,000 in damages. The jury found the City not liable for the Murphys' damages. Following resolution of post-trial motions, the trial court awarded the Murphys $214,666.66 in attorneys' fees, $48,676.32 in expenses, and interest on the judgment at eight percent per annum from the date of the filing of the complaint.

¶14.    The State now appeals to this Court, raising the following issues:

---

[4] The Murphys previously had filed a lawsuit against the State in chancery court, but that action was dismissed.

**I.     Whether the Murphys' claims fail as a matter of law because all property east of the Old Seawall is public trust tidelands.**

**II.    Whether the Murphys' claims are time-barred.**

**III.   Whether the trial court erred in admitting expert testimony on damages that deviated from the "before and after rule."**

**IV.    Whether the jury's award against the State was against the overwhelming weight of the evidence or was the result of bias, prejudice, and passion, requiring either a new trial or a remittitur.**

**V.     Whether the trial court erred in awarding attorneys' fees, expenses, and interest against the State.**

Additional facts will be provided in the Discussion section as they become relevant.

## DISCUSSION

**I.     Whether the Murphys' claims fail as a matter of law because all property east of the Old Seawall is public trust tidelands.**

¶15.   The Mississippi Constitution provides that "[p]rivate property shall not be taken or damaged for public use, except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law[.]" Miss. Const. art. 3, § 17 (1890).  In the instant case, the State did not initiate an eminent domain proceeding because it believed it already owned the property in question. Instead, the Murphys filed a complaint for inverse condemnation, which is "an action or eminent domain proceeding initiated by the property owner, rather than the condemnor[.]" *Jackson Mun. Airport Auth. v. Wright*, 232 So. 2d 709, 713 (Miss. 1970) (quoting 27 Am. Jur. 2d *Eminent Domain* § 478 (1966)).  Inverse condemnation is available "where *private property* has been actually taken for public use without formal condemnation proceedings and where it appears that there is no intention or

9

willingness of the taker to bring such proceedings." *Id.* (emphasis added). The State argued that it owned all property east of the Old Seawall as a matter of law in its motion to dismiss, which the trial court treated as a motion for summary judgment. The trial court denied the State's motion, finding that none of the evidence in the record sufficiently established the boundaries of the public trust tidelands:

> The specific property must be established in the record and the tidelands boundary related to that specific property must be established. That has not been done. There is nothing in this record that would indicate where the State maintains that the tidelands boundary is as that boundary affects, abuts or relates to the subject property. Regardless of which tidelands boundary is accepted (i.e. toe of the seawall or mean high tide), it is not possible on this record to say whether the subject property is wholly within the area designated as tidelands, wholly outside of tidelands boundaries, or partially within tidelands boundaries and partially outside of tidelands boundaries.

Because genuine issues of fact still existed regarding the boundaries of the Murphys' property and of the public trust tidelands adjacent to the property, the trial court found that summary judgment was inappropriate. The State repeated this same argument in its post-trial motion for judgment notwithstanding the verdict (JNOV), which the trial court also denied. On appeal, the State argues that it was entitled to judgment as a matter of law because it owns the property east of the Old Seawall.

¶16. We view this argument from the perspective of the trial court's denial of the State's motion for JNOV, as that was the last occasion on which the trial court considered the argument. The standard of review for the denial of a motion for JNOV is de novo. *Mine Safety Co. v. Holmes*, 171 So. 3d 442, 446 (Miss. 2015). "[J]udgments as a matter of law present both the trial court and the appellate court with the same question – whether the

evidence, as applied to the elements of a party's case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated." *White v. Stewman*, 932 So. 2d 27, 32 (Miss. 2006). "A motion for JNOV is a challenge to the legal sufficiency of the evidence, and this Court will affirm the denial of a JNOV if," viewing the evidence in the light most favorable to the verdict, "there is substantial evidence to support the verdict." *Adcock v. Miss. Transp. Comm'n*, 981 So. 2d 942, 948 (Miss. 2008) (citing *Johnson v. St. Dominics-Jackson Hosp.*, 967 So. 2d 20, 22 (Miss. 2007)).

¶17. The State's claim that it owns all land east of the Old Seawall is based generally on the public trust doctrine, which provides that the State is the "absolute owner of the beds of its shores of the sea, wherever the tide ebbs and flows, as trustee for the people." *Hosemann v. Harris*, 163 So. 3d 263, 269 (Miss. 2015). "[W]hen Mississippi entered the Union in 1817, title to the tidelands and navigable waters which had been held by the United States prior to statehood was conveyed to Mississippi in trust and became immediately vested, subject to the trust." *Sec'y of State v. Wiesenberg*, 633 So. 2d 983, 987 (Miss. 1994) (citations omitted). Tidelands are defined as "those lands which are daily covered and uncovered by water by the action of the tides, up to the mean line of the ordinary high tides." Miss. Code Ann. § 29-15-1(h) (Rev. 2010). "Once land is held by the state in trust, properties are committed to the public (purpose) and may be alienated from the State only upon the authority of legislative enactment and then only consistent with the public purposes of the trust." *Wiesenberg*, 633 So. 2d at 987 (citations omitted). The state's title to tidelands cannot be lost by adverse possession, laches, or any other equitable doctrine. *Id.* at 989.

11

¶18. The Legislature enacted the Public Trust Tidelands Act in 1989 "to resolve the uncertainty and disputes which have arisen as to the location of the boundary between the state's public trust tidelands and upland property and to conform the mean high water boundary line as determined by the Mississippi Supreme Court, the laws of this state and this chapter." Miss. Code Ann. § 29-15-3(2) (Rev. 2010). In furtherance of this purpose, the Tidelands Act required the Secretary of State, in cooperation with other state agencies, to prepare an official map establishing the boundaries of all public trust tidelands in the state. Miss. Code Ann. § 29-15-5(7)(1) (Rev. 2010). A preliminary map was published in 1990, and the Final Public Trust Submerged Land Map ("the Final Map") was completed in December 1994.

¶19. Margaret Bretz, an attorney in the Public Land Division of the Secretary of State's office, testified that she personally visited the coastal areas that were subject to the Final Map and that her division was in charge of notifying landowners whose property was in violation of the Final Map. She explained that the Murphys were not considered "violators" of the Final Map because they did not have any structures encroaching over the Old Seawall at that time the map was being drafted. Bretz also maintained that the Secretary of State used the Old Seawall as the public tidelands boundary in Bay St. Louis, and that the Murphys received general notice of this fact through the publication of the Final Map. As evidence of this notice, the State presented evidence that Ken Murphy had submitted a comment form on the Final Map stating that he wanted the public tidelands boundary to remain at the mean high water line, and that changing the boundary would interfere with his family's business.

¶20. The Bay St. Louis Quadrangle of the Final Map was admitted into evidence at trial. The scale of the map is one inch to 24,000 inches. The public trust tidelands boundary adjacent to the area encompassing the Murphys' property is marked by a solid line on the Final Map. The map's legend provides that this solid line "[d]enotes approximate location of *mean high water line* in areas where the current location of said line (or the toe of the seawall in areas where beach renourishment has occurred) is the boundary of public trust tidelands." (Emphasis added.) The State argues that the Final Map, along with the original deeds to Lots 2 and 4, conclusively establish that the western boundary of public trust tidelands adjacent to the Murphy's property is the toe of the Old Seawall, and that the Murphys never owned any of the property that was the subject of the alleged taking.

¶21. The State's argument is not supported by the Final Map or the Public Trust Tidelands Act. The eastern boundary of the Murphys' property is marked by a solid line on the Final Map, indicating that the public trust tidelands boundary adjacent to their property is either (1) the mean high water line, or (2) the toe of the Old Seawall. The Final Map's legend clearly states that the public trust tidelands boundary is the toe of the seawall only "in areas where beach renourishment has occurred." The term "beach renourishment" can refer only to artificial renourishment, because the Tidelands Act specifically recognizes that "the gradual and imperceptible accumulation of land by natural causes . . . diminish[es] the land subject to the public trust and increase[es] the property owned by the contiguous upland owner." Miss. Code Ann. § 29-15-7(2) (Rev. 2010). At trial, the Murphys submitted testimony that the area where their property is situated was suitable for the natural accretion

13

of a sand beach due to the direction of the tide and wind against the Old Seawall. Additionally, the Murphys uniformly testified that no artificial beach renourishment had occurred on their property and that they actually had prevented such projects from occurring. While the State offered some evidence of artificial renourishment in some areas of Bay St. Louis, it offered no evidence proving conclusively that artificial renourishment had occurred on the property in question.

¶22.    In addition, the Final Map appears to support the Murphys' position that the public tidelands boundary adjacent to their property is *not* the Old Seawall.  Ken Murphy took an aerial photograph of the general area encompassing the property in question in 1994, the same year that the Final Map was published. This photograph was admitted into evidence. The photograph was shot from a point south of the Bay St. Louis Rail Bridge, which is south of the property in question, and shows that the Old Seawall runs essentially in a straight line from the Rail Bridge to a point well north of the Murphys' property.  In contrast, the boundary line depicted on the Final Map is not straight at all, but appears to bulge into a sort of peninsula directly north of the Rail Bridge that roughly matches the area depicted in Ken's photograph. For these reasons, we find that the trial court did not err in denying the State's motion for summary judgment and allowing the case to go to trial.  Moreover, the trial court did not err in denying the State's motion for JNOV, as the evidence was not so deficient as to remove the need for a trier of fact.  At the very least, a factual dispute existed as to the relevant public trust tidelands boundary, and that dispute was resolved by the jury in the Murphys' favor.

14

¶23. The State also alleges that the Guidelines for Use of Preliminary Map of Public Trust Tidelands establish that "[i]n areas where there is a seawall, for instance, . . . Bay St. Louis . . . , property which is seaward of that seawall is claimed as part of the public trust." This document was not admitted into evidence at trial and does not appear in the record. The State alleges that the certified copy of the Guidelines can be found in the Harrison County land records – the copy filed in Hancock County allegedly was lost or destroyed during Hurricane Katrina – and asks this Court to take judicial notice of this document.

¶24. We decline to take judicial notice of the Guidelines for the Preliminary Map. The State did not present the Guidelines to the trial court, nor did it provide a copy of the Guidelines for this Court to review; rather, the State simply quoted a single sentence from the Guidelines in its appellate brief. "This Court cannot consider evidence that is not in the record." *Pratt v. Sessums*, 989 So. 2d 308, 309-10 (Miss. 2008) (citing *Shelton v. Kindred*, 279 So. 2d 642, 644 (Miss. 1973)). But even if this Court did take judicial notice of the Guidelines, they appear to apply only to the Preliminary Map, which was drafted four years prior to the completion of the Final Map and was presented for inspection and revision prior to the drafting of the Final Map. Miss. Code Ann. 29-15-7(4) (Rev. 2010). Even assuming that this document says what the State alleges, the Final Map controls the boundaries of the state's public trust tidelands. *Id.* And based on the evidence in the record, the Final Map establishes that the western boundary of the public trust tidelands adjacent to the Murphys' property is the mean high water line, not the Old Seawall.

15

¶25. We acknowledge that, in a previous case addressing Hancock County's condemnation of certain properties for the construction of the New Seawall in Bay St. Louis, this Court stated that "[t]he planned seawall will be slightly seaward from the former one and will be located on land already owned by the State (public-trust tidelands)." *Carl Ronnie Daricek Living Trust v. Hancock County ex rel. Bd. of Supervisors*, 34 So. 3d 587, 590 (Miss. 2010). The State attempts to characterize this statement as a legal conclusion that all land east of the Old Seawall in Bay St. Louis is public trust tidelands. But the State's argument is misplaced. As an initial matter, the above statement appears only as a general remark in the "Facts and Procedural History" section of the opinion; it had no bearing on the legal issues presented in that case. Whether the New Seawall was constructed on public land elsewhere in Bay St. Louis is not relevant to the instant litigation. But nevertheless, this Court's statement is not necessarily incorrect. Photographs admitted at trial show that, in some (if not most) areas near the Murphys' property, no fastlands existed between the Old Seawall and the Bay of St. Louis at the time the Final Map was completed. Additionally, the State presented evidence that Hancock County had pumped sand against the Old Seawall in some areas of Bay St. Louis to prevent erosion. In either of those cases, the Final Map sets the public trust tidelands boundary at the toe of the Old Seawall. But the instant case is not one of those cases.

¶26. For all these reasons, we find that the State was not entitled to judgment as a matter of law on the basis that the public trust tidelands boundary adjacent to the Murphys' property was the Old Seawall.

16

## II. Whether the Murphys' claims are time-barred.

¶27. As an alternative argument to the above issue, the State asserts that the Murphys are time-barred from bringing an action for inverse condemnation because they failed to challenge the public trust tidelands boundaries established by the Final Map within three years after the map's publication. Statutes of limitation issues present questions of law, which this Court reviews de novo. *Koestler v. Miss. Baptist Health Sys., Inc.*, 45 So. 3d 280, 282 (Miss. 2010).

¶28. The State argues that, because the Murphys' property was not in violation of the Final Map[5] at the time it was published, the instant case is governed by the "catch-all" statute of limitations set forth in Section 15-1-49. That statute provides, "All actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of such action accrued, and not after." Miss. Code Ann. § 15-1-49(1) (Rev. 2012). Relying on this statute, the State asserts that the Murphys' cause of action accrued when the Final Map was published in December 1994.

¶29. The State's argument is without merit. "A cause of action accrues only when it comes into existence as an enforceable action; that is, when the right to sue becomes vested." *Estate of Kidd v. Kidd*, 435 So. 2d 632, 635 (Miss. 1983) (citations omitted). The Murphys' cause of action did not accrue when the Final Map was published, as the State suggests,

---

[5] The Tidelands Act required the Secretary of State to provide notice via certified mail to all landowners whose property was subject to and in violation of the Final Map at the time it was published. Miss. Code Ann. § 29-15-7(4) (Rev. 2010). Those landowners were required to dispute the boundaries established by the Final Map within three years after receiving such notice. Miss. Code Ann. § 29-15-7(6) (Rev. 2010).

17

because the Final Map did not establish that the property in question was public trust tidelands. Stated another way, the Murphys had no cause of action against the State in December 1994, because they still owned the property in dispute after the Final Map was published. The Murphys did not have an enforceable cause of action for inverse condemnation until their property was actually taken by the State and the City for the purpose of constructing the municipal harbor. The State's statute-of-limitations argument is without merit.

### III. Whether the trial court erred in admitting expert testimony on damages that deviated from the "before and after rule."

¶30. Finding that the State is not entitled to judgment as a matter of law, we now address the State's alternative arguments. First, the State asserts that the trial court erred in failing to exclude inadmissible testimony by Robert Crook, the Murphys' expert witness on the subject of real estate appraisal.

¶31. On direct examination, Crook testified that he calculated the Murphys' damages using the "before and after rule," which has been defined by this Court as follows:

> When part of a larger tract of land is taken for public use, the owner should be awarded the difference between the fair market value of the whole tract immediately before the taking, and the fair market value of that remaining immediately after the taking, without considering general benefits or injuries resulting from the use to which the land taken is to be put, that are shared by the general public.

*Miss. State Highway Comm'n v. Hillman*, 198 So. 565, 569 (Miss. 1940) (citations omitted). After conducting an appraisal study, Crook determined that, prior to the taking, the Murphys owned 14,460 square feet of real property valued at $60 per square foot, for a total

18

value of roughly $870,000. After the taking, Crook concluded that the Murphys still owned 3,443 square feet of real property valued at $20 per square foot, for a total value of approximately $70,000. Crook explained that he calculated the difference between the "before" and "after" value as follows:

> I applied the same market conditions adjustment as I did in the before condition and then the after condition I adjusted the sales for location because the Murphy's property no longer is a beach property. It's an interior lot that has a bridge on the south side, a raised ramp bridge, concrete bridge, that curves and goes down to the parking lot that was built where the Murphy's property, beach property, was previously located. So if you were standing in the middle of the Murphy's property looking out towards the bay to the east you see a concrete bridge. If you look south down Beach Boulevard you see a concrete bridge above you. You see no beach. The beach is not there. And the comparable sales were adjusted for the fact that this is a much less desirable property in the after condition after the taking. There's not that much demand for a property with physical characteristics that the property has today or as of the date of taking.

Crook calculated just compensation for the taking to be $800,000, of which $661,560 represented actual compensatory damages for the taking of the property east of the Old Seawall. The remaining $138,440 represented consequential damages to the value of the remaining property.

¶32. On cross-examination, the State asked Crook if the Murphys held riparian and littoral rights to the property east of the Old Seawall. The following exchange then took place:

> Q. So what rights do you – is it your opinion that the rights then that are east of the seawall, southeast of the seawall, relate to riparian – the right to exercise ripatiran and littoral rights?
>
> A. Partially, yes, sir.

19

Q.      And what value did you assign to the value of those or what dollar amount – let me ask it that way, did you assign to the riparian and littoral rights in your appraisal?

A.      Again that would be improper appraisal practice. I appraised the value as a whole property, no individual rights of the 14,460 square feet.

Q.      But you did, in your opinion, establishing $60 per square foot value in the before condition take into consideration value for riparian and littoral rights, did you not?

A.      I did take into consideration that it had access to the water, yes.

Q.      So that would be a yes?

A.      Yes.

Q.      Riparian and littoral rights?

A.      Yes.

Q.      In the after condition you have a different per square foot value. I believe you said $20 per square foot, and you assigns [sic] consequential damages if I understand you correctly of $138,000 and change?

A.      Yes, sir.

Q.      Let's be specific. $138,440, is that the consequential damages, is that related to the taking of the riparian and littoral rights?

A.      Partially.

Q.      Can you tell me how much of that $138,400 was related to the taking of riparian and littoral rights?

A.      No, I cannot.

Q.      Can you give me some type of idea? I mean, are you just saying it's all lumped in there, in the $138,440?

A.      That's correct.

Q. And you can't breakout what part of that $138,440 is related to the alleged taking of riparian and littoral rights? You can't break that out, can you?

A. No I cannot.

Q. But it is a part and component of your estimate of damages, consequential damages to the remainder, correct?

A. Yes, sir.

On redirect examination, Crook clarified his prior statements concerning riparian and littoral rights:

Q. You were asked questions about littoral and riparian rights to the water. In your understanding, and if you don't know as an appraiser maybe it's a legal question, but your understanding is ownership rights and are those rights the same thing?

A. Yes, sir.

Q. Fee simple ownership of property?

A. Yes, if it's on navigable.

Q. Mr. Crook, if this jury finds based upon the deeds, the records, the other testimony from experts that are title people that at the time this project was built, at the time that the city came on the property and took possession of the property and began building the harbor, if they find that the fee simple title was in the Murphy's [sic] and you've value [sic] that property do you value the ownership of that property for the entire property or just a portion of the property?

A. You have to value it as the whole property and not just part.

Q. Is that what you did with the 14,000 plus square feet that you measured off that went from the right-of-way to the edge of the water?

A. 14,460 square feet, yes, sir.

21

¶33.	At the conclusion of Crook's testimony, the State moved to strike and exclude the entirety of his testimony because he had considered noncompensable elements in calculating the Murphys' damages. Specifically, the State argued that the Murphys could not recover for the loss of their littoral or riparian rights because the property in question was taken for a higher public purpose. *See Miss. State Highway Comm'n v. Gilich*, 609 So. 2d 367 (Miss. 1992). The Murphys responded that the State's "higher public purpose" argument applies only when the State imposes an *additional* public use on existing public property that denies adjacent landowners their littoral rights. Because the property in question was not previously owned by the State, the Murphys argued that they were entitled to recover for loss of access to the water. The trial court agreed with the Murphys and denied the State's motion, also noting that the State had failed to object during Crook's testimony.

¶34.	On appeal, the State argues that Crook erroneously reduced the property's "after" value by an unspecified amount for loss of littoral rights, even though such loss is not compensable under Mississippi law. This Court has held that the application of the before-and-after rule and whether the trial court erred in allowing a departure from the rule are questions of law subject to de novo review. *Miss. Transp. Comm'n v. Fires*, 693 So. 2d 917, 920 (Miss. 1997).

¶35.	"The 'before-and-after rule' swallows and absorbs all damages of every kind and character." *Miss. State Highway Comm'n v. Hall*, 174 So. 2d 488, 492 (Miss. 1965). "[W]e have consistently enforced this conclusive presumption in after-the-fact inverse condemnation actions." *King v. Miss. State Highway Comm'n*, 609 So. 2d 1251, 1253

22

(Miss. 1992). "Aesthetics enter into an eminent domain proceeding only insofar as they affect the fair market value of the property . . . ." *Miss. State Highway Comm'n v. Viverette*, 529 So. 2d 896, 900 (Miss. 1988). In addition, "[t]his Court has held that [littoral] rights are not property rights, per se; instead, they are mere licenses or privileges." *Gilich*, 609 So. 2d at 375 (Miss. 1992) (citing *Catchot v. Zeigler*, 92 Miss. 191, 45 So. 707 (1908)). "[W]here the State has exercised its power to impose an *additional public use on property already set aside for public purpose*, the injury to riparian or littoral licenses is not a taking of private property for which compensation must be made." *Id.* (emphasis added).

¶36. After reviewing Crook's testimony in context, we find that Crook did not include noncompensable elements of damages in his calculations. The State's argument, that Crook improperly included the loss of littoral rights in his calculation of damages, is based on a mischaracterization of Crook's testimony. Crook did not even mention littoral or riparian rights during his direct examination. He simply explained the characteristics of the property that he considered in calculating fair market value before and after the taking, including the fact that the property no longer had access to or a view of the ocean after the taking. "[W]itnesses may testify concerning any specific quality, item or change in the property or its attributes, so long as this is ultimately related to the value of the property remaining after the taking." *State Highway Comm'n v. Havard*, 508 So. 2d 1099, 1101-02 (Miss. 2014). In addition, to the extent that landowners "can show diminution in value from loss of view or access due to alteration of the use of that land, they are entitled to compensation." *Gilich*, 609 So. 2d at 375. While the State was able to get Crooks to say the phrase "riparian and

23

littoral rights" on cross-examination, it is clear from the transcript that Crook was referring to the Murphys' compensable rights to access and view the ocean due to the property's oceanfront status when he used those terms. The trial court did not err in failing to exclude Crook's testimony.

¶37. Ultimately, though, it appears that any reference to littoral rights during Crook's testimony would be harmless error, if any. The trial court affirmatively instructed the jury that it could not consider the loss of littoral rights in calculating just compensation for the taking if it found that those rights were revoked for the greater public good. "Generally speaking, our law presumes that jurors follow the trial judge's instructions, as upon their oaths they are obliged to do." *Parker v. Jones Cty. Cmty. Hosp.*, 549 So. 2d 443, 446 (Miss. 1989). This presumption is supported by the jury's verdict. Crook testified on cross-examination the Murphys' loss of "littoral rights" was included in his calculation of consequential damages, which totaled $138,440. The jury's award of damages was $644,000, which is $17,560 less than Crook's calculation of compensatory damages alone, and $156,000 less than Crook's total calculation when consequential damages are included. Thus, even if Crook did improperly include the loss of littoral rights in his calculations, it does not appear that the jury considered those rights in its ultimate determination of just compensation. *See K.M. Leasing, Inc. v. Butler ex rel. Butler*, 749 So. 2d 310, 324-25 (Miss. 1999) (finding that any error in allowing hedonic damages expert to testify was harmless, as the testimony was not indispensable to the jury's verdict, and there was sufficient other evidence on which the jury could have based its verdict).

**IV.   Whether the jury's award against the State was against the overwhelming weight of the evidence or was a result of bias, prejudice, and passion requiring either a new trial or a remittitur.**

¶38.   In its post-trial motion for a new trial, the State raised several arguments supporting the reversal of the jury's verdict.  First, the State argued that the Murphys' claim of ownership to the property between the Old Seawall and the water's edge was not supported by the weight of the evidence.  Second, the State argued that the trial court erred in allowing certain discovery responses by the City to be presented to the jury.  Finally, the State argued that the jury's decision to hold it wholly liable for the Murphys' damages was the result of bias, prejudice, or passion, because it did not build the New Seawall or the harbor.  Alternatively, the State asked the trial court to order a remittitur of the jury's award of damages.  The trial court rejected each of these arguments and upheld the jury's verdict as rendered.  On appeal, the State reasserts each of the arguments presented in its motion for a new trial.

¶39.   "A new trial may be granted in a number of circumstances, such as when the verdict is against the substantial or overwhelming weight of the evidence." *White v. Yellow Freight Sys., Inc.*, 905 So. 2d 506, 510 (Miss. 2004) (citing *Shields v. Easterling*, 676 So. 2d 293, 298 (Miss. 1996)).  This Court reviews the denial of a motion for a new trial under the abuse-of-discretion standard.  *Steele v. Inn of Vicksburg, Inc.*, 697 So. 2d 373, 376 (Miss. 1997) (citations omitted).  This Court must view the evidence in the light most favorable to the jury's verdict.  *Dependable Abrasives, Inc. v. Pierce*, 156 So. 3d 891, 895 (Miss. 2015) (citations omitted).  Additionally, because this Court affords great deference to jury

25

verdicts, "conflicts of evidence presented at trial are to be resolved by the jury," not this Court. *Lift-All Co. v. Warner*, 943 So. 2d 12, 16 (Miss. 2006) (quoting *Blossman Gas, Inc. v. Shelter Mut. Gen. Ins. Co.*, 920 So. 2d 422, 426 (Miss. 2006)). Ultimately, this Court will not disturb the jury's verdict "unless it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Johnson v. St. Dominics-Jackson Mem'l Hosp.*, 967 So. 2d 20, 23 (Miss. 2007) (quoting *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2006)). We discuss each of the State's asserted grounds for relief separately below.

### A. Whether the Murphys' claim of ownership to the disputed property is supported by the weight of the evidence.

¶40. While the State bore the burden of proving that the property in dispute was public trust tidelands, it maintains that the Murphys bore an equal burden of proving that they actually owned all of the land in question, because they cannot claim compensation for that which they do not own. *See Gilich*, 609 So. 2d at 375 (citing *State Highway Comm'n v. McDonald's Corp.*, 509 So. 2d 856, (Miss. 1987)). The State argues that the overwhelming weight of the evidence does not support the Murphys' claim of title to the property from the Old Seawall to the water's edge.

¶41. At trial, the Murphys presented the original deeds to Lots 2 and 4, which referenced the "mean high water tide" or "water's edge" as the eastern boundary of the property. The Murphys also admitted the Drake Plat, which reflects that the property boundaries for Lots 2 and 4 extended beyond the Old Seawall around 1922. The Murphys also argued that the Final Map published by the State in 1994 established the mean high water line as the eastern

26

boundary of their property because there was no evidence that beach renourishment had taken place on the property. Finally, the Murphys admitted the Clarke Survey – the only survey of the property conducted prior to the commencement of the instant litigation – which was used to update the legal descriptions of Lots 2 and 4 to account for the accretion of a sand beach on the property over time. The deeds to Lots 2 and 4 drafted after 2001 incorporate the Clark Survey by reference and explicitly convey property east of the Old Seawall, to the water's edge.

¶42.    The State argues that the Murphys' "self-serving" deeds are insufficient to establish their claim that they owned any property east of the Old Seawall. At trial, the State called Robert Schwartz, a real estate lawyer, as an expert witness. Schwartz conducted a title search for Lots 2 and 4 and examined the records for the properties going back to 1905 (Lot 4) and 1924 (Lot 2). Schwartz testified that, prior to 2001, the legal descriptions of the properties were consistent and conveyed only property from Front Street to the Old Seawall. Based on his review of the chain of title, Schwartz opined that the State owned the land east of the Old Seawall. In addition, the State hired Robert Cassady to conduct a survey of the property.[6] The Cassady survey confirms that the distance between Front Street and the Old Seawall on Lot 2 was 85.04 feet, and the distance on Lot 4 was 91.27 feet. These distances are longer than the call measurements for the north and south boundary lines in the original legal descriptions for Lots 2 and 4. Finally, the State presented evidence showing that the Murphys had attempted to lease property east of the Old Seawall from the Secretary of State

---

[6] The jury was taken to the property in question to view the relevant boundary measurements referenced in the Casssady survey.

27

on two occassions. In 1996, the Murphys filed an application to lease property east of the Old Seawall for the purpose of building a hotel development and a pier. This project ultimately fell through, and Bretz wrote a letter to the Murphys indicating that the State could not lease the tidelands adjacent to their property for private use. In 2009, the Murphys sought to lease property beyond the Old Seawall to build a deck similar to the one attached to their restaurant prior to Hurricane Katrina. The record does not reveal what became of this project. Based on this evidence, along with the Final Map and the Secretary of State's consistent assertions that property east of the Old Seawall in Bay St. Louis was public property, the State argues that the overwhelming weight of the evidence does not support the Murphys' claim of ownership to the property in question.

¶43. While the evidence is conflicting, we find that the weight of the evidence supports the jury's finding that the Murphys owned the property in question. The State focuses on the fact that the deeds to Lots 2 and 4 historically contained consistent boundary measurements reflecting the distance from Front Street to the Old Seawall, or a few feet west of the Old Seawall. But this argument overlooks the fact that these same deeds also reference the "mean high water tide of the western bank of the Bay of St. Louis" or "water's edge of the Bay of St. Louis" as the eastern boundary of the property in question. We also note that the oldest deed in the record for Lot 4 was executed in 1905, twelve years before the Old Seawall was completed. The State's expert witness admitted on cross-examination that every deed in the Murphys' chain of title lists the Bay of St. Louis as the eastern boundary of the property. On the other hand, none of the deeds in the chain of title makes any reference to

28

the Old Seawall. While the Clarke Survey admittedly changes the legal description of the property from that found in the original deeds, this change simply memorialized the fact that a beach had formed east of the Old Seawall over the intervening eighty-four years. Because the State failed to present sufficient evidence proving that this beach was created artificially, the Final Map, the Tidelands Act, and the Murphys' deeds support the conclusion that this property was owned by the Murphys.

### B. Whether the State was prejudiced by the admission of the City's deemed discovery admissions.

¶44. During pretrial discovery, the Murphys propounded a series of requests for admission to the State and the City. Among other things, the Murphys sought an admission that the tidelands boundary depicted in the Final Map meanders along the mean high water line; that the Murphy property extends to the mean high water line; that the City and State took full possession of the Murphy property on January 3, 2012; that the City did not seek permission from upland owners for the development of the municipal harbor; and that public funds were being used for the construction of the harbor. The State timely responded to the Murphys' requests; the City, however, did not. Accordingly, the trial court held that the Murphys' requests for admission would be deemed admitted by the City.

¶45. At trial, the Murphys requested that the City's deemed admissions be presented to the jury. The State objected, arguing that it would be unduly prejudicial to present the City's admissions without also including the State's responses. The trial court agreed that the jury needed to be instructed that any admissions by the City did not bind the State. Thus, the trial court ordered the Murphys to draft the City's deemed admissions in a format precisely

29

tracking the requests as they were filed and clearly explaining that such admissions were not binding on the State. After reviewing the amended admissions, the State requested a few revisions, which the Murphys incorporated. The City's deemed admissions were then admitted at the conclusion of the Murphys' case-in-chief. The jury also was instructed at the conclusion of the trial that "any admissions by the City of Bay St. Louis are binding only on the City of Bay St. Louis, and not the State of Mississippi."

¶46.    On appeal, the State argues that the admission of the City's deemed admissions at trial resulted in extreme prejudice to its defense, causing the jury to find the State wholly liable for taking the Murphys' property.  We review the trial court's rulings on discovery matters for an abuse of discretion. ***Earwood v. Reeves***, 798 So. 2d 508, 514 (Miss. 2001) (citing ***Dawkins v. Redd Pest Control Co.***, 607 So. 2d 1232, 1235 (Miss. 1992)).  We find that the State's argument is without merit.  Because the City failed to respond to the Murphys' requests for admissions, the trial court clearly acted within its discretion to deem those requests admitted by the City. *See* Miss. R. Civ. P. 36(a) ("The matter [of which an admission is requested] is admitted unless, within thirty days after service of the request, or within such shorter or longer time as the court may allow, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter[.]"). The State did not object to the admissibility of the City's deemed admissions, but only to the format in which they were admitted. And on the State's request, the trial court ordered the Murphys to amend the City's deemed admissions so that they clearly stated that they did not apply to the State.  Moreover, the jury was instructed that the City's admissions

30

did not apply to the State. There is no evidence in the record supporting the State's argument that the jury's verdict was inflamed or influenced by the presentation of the City's deemed admissions.

### C. Whether the verdict was the result of the jury's bias, prejudice, or passion against the State.

¶47. The City took full possession of the Murphys' property on January 3, 2012, and no evidence in the record suggests that the State played any part in the actual construction of the harbor. Nevertheless, at the conclusion of the trial, the jury returned a verdict finding the State wholly liable for taking and damaging the Murphys' property. The jury found that the City was not liable, even though the City was forced to make several admissions due to its failure to respond to the Murphys' discovery requests. The State argues that the jury's decision not to allocate any liability to the City was so contrary to the weight of the evidence as to exhibit prejudice or bias against the State.

¶48. We find that the State's argument is without merit. The State claimed true ownership of the property under the authority of the Tidelands Act, or alternatively, its sovereign power of eminent domain. As such, the State is listed as the lessor of the property in the Public Trust Tidelands lease to the City, and the lease states that "fee simple title to LEASE PREMISES is vested in LESSOR." While the City is the entity that ultimately built the harbor, it could not have done so without the State's consent. Stated another way, there is no evidence in the record indicating that the City could have constructed the harbor without the State first exercising a claim of ownership over the property. Because the State's claim

31

of ownership ultimately converted private property to public use, the jury acted reasonably in assessing the full amount of damages to the State.

### D. Whether the State is entitled to a remittitur.

¶49. While not set out in a separate issue in its brief, the State asserts throughout this section of its brief that it is entitled to a remititur. This argument is based on the Murphys' testimony at trial that the construction of the New Seawall by the Army Corps of Engineers caused approximately ninety percent of the damage to their property.[7] In reliance on this testimony, the State argues that the jury was limited to awarding the Murphys ten percent of whatever total damages were proven at trial. Because Crook testified that just compensation for the taking of the Murphys' property would be $800,000, the State asserts that this Court should reduce the jury's award of damages to $80,000.

¶50. This Court has explained the standard for reviewing a claim for a remittitur as follows:

> There are no fixed standards as to when an additur or remittitur is proper. *Leach v. Leach*, 597 So. 2d 1295, 1297 (Miss. 1992). Therefore, we proceed on a case-by-case basis in determining whether a jury award is excessive. *Biloxi Elec. Co. v. Thorn*, 264 So. 2d 404, 405 (Miss. 1972). We will not disturb a jury's award of damages unless its size, in comparison to the actual amount of damage, shocks the conscience. *City of Jackson v. Locklar*, 431 So. 2d 475, 481 (Miss. 1983). The standard of review for the denial of a remittitur is abuse of discretion. *Odom v. Roberts*, 606 So. 2d 114, 121 (Miss. 1992). A remittitur is appropriate when either (1) the jury or trier of fact was influenced by bias, prejudice, or passion, or (2) the damages were contrary to the overwhelming weight of the evidence. *Rodgers v. Pascagoula Pub. Sch. Dist.*, 611 So. 2d 942, 944 (Miss. 1992). "The bias, prejudice or passion standard is purely a circumstantial standard[.]" *Cade v. Walker*, 771 So. 2d 403, 407 (Miss. Ct. App. 2000). "[E]vidence of corruption, passion, prejudice

---

[7] The State previously had moved to dismiss the Murphys' lawsuit because they had not named the Army Corps of Engineers as a defendant. This motion was denied, and the State does not raise this issue on appeal.

or bias on the part of the jury (if any) is an inference . . . to be drawn from contrasting the amount of the verdict with the amount of the damages." *Rodgers*, 611 So. 2d at 944-45.

*Entergy Miss., Inc. v. Bolden*, 854 So. 2d 1051, 1058 (Miss. 2003). Based on these standards, we find that the State is not entitled to a remittitur. The State's argument regarding the New Seawall takes the Murphys' deposition testimony out of context. Ray clarified the aforementioned statements during his testimony at trial, explaining that he and his brothers considered the New Seawall and the municipal harbor to be part of one project. The Murphys testified that other upland property owners had received permits to build over the New Seawall, and they believed that they would have the same option, since the seawall did not completely block their access to or view of the beach. The construction of the harbor, however, did completely cut off their access to and view of the beach. Thus, in the Murphys' estimation, these projects combined caused a ninety percent devaluation of their property. In addition, the jury was instructed that it could not hold the State liable if it found that the damage to the Murphys' property was caused solely by the Army Corps of Engineers. Finally, we note that the jury's award of damages was lower than the Murphys' calculation of compensatory damages caused by the taking. Accordingly, we find that the jury's verdict should not be disturbed.

**V.    Whether the trial court erred in awarding attorneys' fees, expenses, and interest against the State.**

¶51.    In addition to just compensation for the taking of their property, the Murphys' complaint requested attorneys' fees and expenses pursuant to Section 43-37-9 of the Mississippi Code. At the conclusion of their case-in-chief, the Murphys reserved the right

33

to present the matter of fees and expenses after trial in the event that the jury returned a verdict in their favor. Accordingly, after the jury reached its verdict, the Murphys filed a motion requesting $214,666.66 in attorneys' fees, $48,676.32 in expenses, and interest at the rate of eight percent from the date of the filing of the complaint. The State responded that the Murphys were not entitled to attorneys' fees or expenses under Section 43-37-9 and were not entitled to interest in the manner requested. After a hearing on the matter, the trial court issued a twenty-page order granting the Murphys' motion for attorneys' fees, expenses, and interest. On appeal, the State argues that the trial court erred in granting the Murphys' motion.

¶52. "A trial court's decision on attorneys' fees is subject to the abuse of discretion standard of review." *Bank of Miss. v. S. Mem'l Park, Inc.*, 677 So. 2d 186, 191 (Miss. 1996) (citing *Barber v. Barber*, 105 So. 2d 630 (Miss. 1958)). However, a party is not entitled to attorney's fees unless a statute or other authority so authorizes. *McLain v. West Side Bone & Joint Ctr.*, 656 So. 2d 119, 123 (Miss. 1995). "Costs and fees are not recoverable in eminent domain cases as a matter of constitutional right, . . . but are a matter of Legislative grace." *City of Gulfport v. Anderson*, 554 So. 2d 873, 878 (Miss. 1989) (citing *State Highway Comm'n v. Hayes*, 541 So. 2d 1023, 1026 (Miss. 1989)). Thus, whether the Legislature has authorized an award of attorneys' fees under the facts of this case is a question of law to be reviewed de novo. *Bank of Miss.*, 677 So. 2d at 191.

¶53. Section 43-37-9 authorizes the trial court to award reasonable expenses, including attorneys' fees, in specific inverse condemnation proceedings. The statute provides:

34

> Where an inverse condemnation proceeding is instituted by the owner of any right, title or interest in real property because of use of his property *in any program or project in which federal and/or federal-aid funds are used*, the court, rendering a judgment for the plaintiff in such proceeding and awarding compensation for the taking of property, or the state's attorney effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will, in the opinion of the court or the state's attorney, reimburse such plaintiff for his *reasonable costs, disbursements and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding*.

Miss. Code Ann. § 43-37-9 (Rev. 2015) (emphasis added). The State argues that Section 43-37-9 does not authorize an award of attorneys' fees or expenses in this case because the Murphys presented no evidence that the State had used the property in question in any program or project. The State also argues that it did not receive federal or federal-aid funds for the construction of the New Seawall or the harbor.

¶54. The State's argument runs contrary to the plain language of Section 43-37-9. "If the words of a statute are clear and unambiguous, the Court applies the plain meaning of the statute and refrains from using principles of statutory construction." *Lawson v. Honeywell Intern., Inc.*, 75 So. 3d 1024, 1027 (Miss. 2010). The trial court found Section 43-37-9 to be unambiguous, and we agree with the trial court's finding. Section 43-37-9 does not limit the source of recovery to the party who actually used the property or received federal funds, as the State suggests, but broadly orders the trial court to award reasonable expenses in any case in which private property is being used "in any program or project in which federal and/or federal-aid funds are used." Miss. Code Ann. § 43-37-9 (Rev. 2015). And as the trial court found, "the State claimed the property and asserted control over it, leasing it to the City to construct a harbor, and the jury found that this property belonged to the Murphys." In

addition, the State stated in its discovery responses that, upon information and belief, federal funds were being used in the construction of the harbor. Accordingly, we hold that the unambiguous language of Section 43-37-9 authorizes the award of attorneys' fees and expenses in the instant case.

## CONCLUSION

¶55.   For the foregoing reasons, we affirm the jury's verdict.

¶56.   **AFFIRMED.**

**DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, KING, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR.**